UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SARA CROWE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 16-12033-JGD |
| HARVEY KLINGER, INC. | ) | |
| and HARVEY KLINGER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM DECISION AND ORDER ON DEFENDANTS'
## MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

September 30, 2017

DEIN, U.S.M.J.

### I. INTRODUCTION

Plaintiff, Sara Crowe ("Ms. Crowe"), is a resident of Massachusetts and has brought this

action against her former employer, Harvey Klinger, Inc. (the "Agency"), and its principal and

CEO, Harvey Klinger. This action arises out of an employment dispute. Ms. Crowe, a literary

agent, contends that her employment contract required the Agency to pay her commissions on

deals related to authors she had brought to the Agency, regardless of whether she continued to

be employed by the Agency. Ms. Crowe alleges that in violation of her employment contract,

the defendants stopped paying her commissions upon her resignation from the Agency. By her

First Amended Complaint ("FAC") (Docket No. 4), Ms. Crowe has asserted claims against the

defendants for violation of New York Labor Law § 198 (The New York Wage Theft Prevention

Act ("WTPA")) (Count I), violation of New York Labor Law § 195(1) (Count II), violation of the

anti-retaliation provisions of the WTPA (Count III), violation of Mass. Gen. Laws ch. 149 § 148 (The Massachusetts Wage Act) (Count IV), violation of Mass. Gen. Laws ch. 149 § 150 (Count V), and relief pursuant to 28 U.S.C. § 2201 (the Declaratory Judgment Act) (Count VI). (See FAC ¶¶ 35-68).

This matter is before the court on "Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue and Forum Non Conveniens." (Docket No. 9). By their motion, the defendants contend that all of Ms. Crowe's claims must be dismissed pursuant to Fed. R. Civ. P. 12(b)(2) because the defendants lack sufficient contacts with Massachusetts to support this court's exercise of personal jurisdiction over them. The defendants also contend that if this court determines that it has jurisdiction, it should nevertheless transfer this action to the federal district court for the Southern District of New York pursuant to 28 U.S.C. § 1404 on the basis of *forum non conveniens*.

For the reasons detailed herein, this court finds that the defendants are subject to this court's jurisdiction and that transfer is not warranted. Accordingly, the defendants' motion is DENIED.

## II. STATEMENT OF FACTS

### Standard of Review of Record

"On a motion to dismiss for want of personal jurisdiction, the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists." Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 8 (1st Cir. 2009), and cases cited. "When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, as in this case, the 'prima facie' standard governs its determination." United States v. Swiss Am. Bank,

_Ltd._, 274 F.3d 610, 618 (1st Cir. 2001).  Under this standard, the plaintiff must "demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution."  _Id._ (quotations and citation omitted).  Thus, to meet her burden in this case, Ms. Crowe must "proffer evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction."  _Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc._, 825 F.3d 28, 34 (1st Cir. 2016).  The court will "take the facts from the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to the plaintiff's version of genuinely contested facts."  _Id._  It will "then add to the mix facts put forward by the defendants, to the extent that they are uncontradicted."  _N. Laminate Sales, Inc. v. Davis_, 403 F.3d 14, 24 (1st Cir. 2005) (quoting _Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A._, 290 F.3d 42, 51 (1st Cir. 2002)) (additional quotations and citation omitted).

Applying this standard to the instant case, the relevant facts are as follows.[1]

### **The Parties**

Sara Crowe, a literary agent by profession, is currently domiciled in Milton, Massachusetts.  (FAC ¶ 1).  Harvey Klinger, Inc. is a literary agency incorporated under the laws of New York with its principle place of business in New York, New York.  (Id. ¶ 2).  Harvey Klinger is the sole owner of the Agency (Klinger Decl. ¶ 1) and is the principal and CEO.  (FAC ¶ 9).  He is also a literary agent for the Agency.  (Klinger Decl. ¶ 4; Crowe Aff. ¶ 18).  In his capacity as a literary

---

[1]  The facts are derived from the following materials: (1) the FAC and exhibits thereto (FAC Ex. __); (2) the affidavit of Sara Crowe ("Crowe Aff.") and the exhibits thereto (Crowe Aff. Ex. __) (Docket No. 14); (3) the declaration of Harvey Klinger ("Klinger Decl."), which is attached to defendant's motion to dismiss as Ex. 2 (Docket No. 9); (4) the reply declaration of Harvey Klinger ("Klinger Reply Decl."), which is attached to defendants' reply memorandum as Ex. 1 (Docket No. 16); (5) other attachments to plaintiff's opposition (Pl. Ex. __) (Docket No. 13); and (6) other attachments to defendants' reply memorandum (Def. Ex. __) (Docket No. 16).

agent, Mr. Klinger has done business in Massachusetts "for a writer if a publishing house in Massachusetts is offering a publishing contract." (Klinger Decl. ¶ 4). Ms. Crowe asserts, and Mr. Klinger does not dispute, that he resides and votes in Pennsylvania. (Crowe Aff. ¶ 27). Mr. Klinger owns a half interest in a "vacation – long weekend" house in Provincetown, Massachusetts, which is "half rented summers only." (Klinger Decl. ¶ 3).

### The Employment Relationship

Ms. Crowe was employed as a literary agent by the Agency from February 1, 2005 to September 8, 2016. (Crowe Aff. ¶ 1; FAC ¶ 9). She was hired by and worked for Mr. Klinger. (Id.). As a literary agent for the Agency, Ms. Crowe represented children's, young adult, and adult fiction writers and eventually specialized in representing children's authors. (Crowe Aff. ¶¶ 2-3). She represented her authors' written work to publishers, assisted in the sale and deal negotiation of those authors' works in domestic and foreign markets, and was responsible for initiating and maintaining relationships with authors. (FAC ¶ 10-11). During her employment with the Agency, Ms. Crowe developed a number of agent relationships with authors of children's books and became one of the top selling children's books agents. (Crowe Aff. ¶ 3). By the end of her employment with the Agency, Ms. Crowe personally represented a "significant number" of the authors signed with the Agency, including New York Times bestselling and award winning authors and titles. (Id. ¶ 28; FAC ¶ 10-11).

In 2014, Ms. Crowe and Mr. Klinger agreed that Ms. Crowe's wages would be paid exclusively by commission in an amount equal to 70% of the commission that the Agency received on authors Ms. Crowe sourced. (Crowe Aff. ¶ 4). This agreement was oral and was never reduced to writing. (Klinger Reply Decl. ¶ 23). Ms. Crowe alleges that the agreement did

not include a requirement that Ms. Crowe remain employed by the Agency to receive these funds (Crowe Aff. ¶ 4).  She also alleges that she repeatedly requested that Mr. Klinger reduce the commission agreement to writing, but that he refused to do so.  (Crowe Aff. ¶ 5). Nevertheless, the Agency paid Ms. Crowe 70% of the commissions it received from Ms. Crowe's authors.  (FAC ¶ 19).

### Ms. Crowe's Move to Massachusetts

In mid-2015, Ms. Crowe's husband was transferred to Massachusetts, and Ms. Crowe subsequently informed Mr. Klinger that she needed to move to and work from Massachusetts. (Crowe Aff. ¶ 7).  Mr. Klinger agreed to allow Ms. Crowe to work from home in Massachusetts, and Ms. Crowe moved here in June 2015.  (Id.).  Ms. Crowe states that if Mr. Klinger had not agreed to the move, she "would have been forced to leave Harvey Klinger, Inc. at the time." (Id.).  In fact, it is apparently undisputed that either party could have terminated the employ-ment relationship, and that the Agency was not obligated to permit Ms. Crowe to work in Massachusetts.  (See Klinger Reply Decl. ¶ 30 (plaintiff's "employment had no term and either party could terminate at will")).

Ms. Crowe asserts that it was not intended that she commute to the Agency in New York after she moved to Massachusetts, and she was not given a travel budget to do so.  (Crowe Aff. ¶ 8).  During the remainder of 2015, she spent a total of six days in the New York office, and she spent fewer days there in 2016.  (Id. ¶ 11).  It is undisputed, however, that she maintained an office at the Agency in New York (Klinger Decl. ¶ 6) and kept some personal items there. (Crowe Aff. ¶ 16).

From June 2015 until her resignation on September 8, 2016, Ms. Crowe worked on a full-time basis for the Agency from Massachusetts, communicating with her authors and with Mr. Klinger by mail, email, and phone. (Id. ¶ 10). Mr. Klinger himself attests that he had numerous telephone calls and email communications with Ms. Crowe about manuscripts, contracts, and "all the details of [their] work" while she resided in and worked from Massachusetts. (Klinger Reply Decl. ¶ 4). At the time of those communications, Mr. Klinger assumed that Ms. Crowe was at home. (Klinger Decl. ¶ 4).

Ms. Crowe estimates that she brought approximately ten new authors to the Agency, while she was working in Massachusetts. (Crowe Aff. ¶ 12). She claims, although the Agency disputes, that one of those new authors resided in Massachusetts. (Id.; see Klinger Reply Decl. ¶ 7). Two of the publishers of her clients' books were located in Massachusetts. (Crowe Aff. ¶ 13). It is undisputed that Ms. Crowe engaged in various networking activities in Massachusetts, including having lunch with authors who lived in Massachusetts and attending readings in libraries and bookstores in the Boston area. (Id.). She also attended a number of conferences on behalf of the Agency, including an American Library Association Conference in Boston, Massachusetts, a New England Society of Children's Books Writers and Illustrators conference in Springfield, Massachusetts, a South by Southwest Conference in Austin, Texas, and The Bologna Book Fair in Bologna, Italy. (Id. ¶11). According to Ms. Crowe, at the time she left the Agency she had over 50 author/clients across the United States, including three from Massachusetts and one who resides internationally. (Crowe Aff. Ex. B).

Ms. Crowe asserts that during the course of her employment in Massachusetts, she represented a "significant number" of authors signed with the Agency and that, for the year

2015, the revenues generated from her authors were more than half of the Agency's total revenues that year. (Crowe Aff. ¶ 28). The parties disagree as to whether Ms. Crowe was expected to be taxed under Massachusetts or New York law. (Crowe Aff. ¶ 9; Klinger Decl. ¶ 6).

Ms. Crowe asserts that she "typically received at least a portion of [her] commission payments" by check, signed by Mr. Klinger, via mail at her Massachusetts address. (Crowe Aff. ¶ 29).

### Ms. Crowe's Resignation

Ms. Crowe began discussions with a different literary agency in late August 2016 and received an initial offer of employment on August 31, 2016. (Crowe Aff. ¶ 15). By September 8, 2016, she had reached an agreement with her future new employer and decided to leave the Agency. (Id.). On September 8, 2016, Ms. Crowe took the train to New York to speak with Mr. Klinger about her decision to leave, and also to pick up "a few personal belongings" in the office and say goodbye to former co-workers. (Id. ¶ 16). Mr. Klinger was not in the office, so Ms. Crowe called him to say that she was resigning. (Id. ¶ 17).

After informing Mr. Klinger of her resignation, Ms. Crowe called her authors, with the exception of the author she shared with Mr. Klinger, on her cell phone to notify them of the change in circumstances. (Crowe Aff. ¶ 18; 21). She told them that they had the option to stay with Harvey Klinger, Inc., follow her to her new agency, or find a new agency. (Id.). Ms. Crowe offered her authors, with the exception of a few authors who had been "inactive," the opportunity to follow her to her new agency, and they accepted. (Id.).

On September 30, 2016, defendants advised Ms. Crowe through counsel that they would "hold the check [Klinger] was going to pay her under protest now"; allegedly accused Ms.

Crowe of being a "faithless servant" under New York law; and proposed a way to handle commissions in light of her departure from the Agency. (See Crowe Aff. ¶ 24; FAC ¶ 27). Ms. Crowe asserts that she asked to be able to consider this offer over the weekend, did so, and then decided not to accept it. (Crowe Aff. ¶ 25).

On October 5, 2016, Ms. Crowe filed a Wage Claim with the Massachusetts Attorney General. (FAC ¶ 34). She received a right to sue letter on October 12, 2016 and filed a complaint in this matter with this court the same day. (Id. ¶ 28, 34). On October 19, 2016, the Agency issued two checks to Ms. Crowe for commissions earned from Ms. Crowe's authors. (Id. ¶ 29). These checks were delivered to her Massachusetts address. (Crowe Aff. ¶ 30). Both checks were signed by Mr. Klinger and contained the following statement above the endorsement line: "Paid under protest. No contractual obligation to pay royalties after resignation exists. Payor retains the right to re-claim upon judicial resolution of this issue[.]" (FAC ¶ 29-30; FAC Ex. A). The first check was dated October 4, 2016 and was allegedly for the pay period of September 12 through September 30, 2016. (FAC ¶ 30; FAC Ex. A). The second check was dated October 17, 2016 and was allegedly for the pay period of October 1 through October 15, 2016. (FAC ¶ 32; FAC Ex. A).

Additional facts will be provided below where appropriate.

### III.  **ANALYSIS**

As described above, Ms. Crowe has asserted claims against the defendants for violation of New York Labor Law § 198 (The New York Wage Theft Prevention Act ("WTPA")) (Count I), violation of New York Labor Law § 195(1) (Count II), violation of the anti-retaliation provisions of the WTPA (Count III), violation of Mass. Gen. Laws ch. 149 § 148 (The Massachusetts Wage

Act) (Count IV), violation of Mass. Gen. Laws ch. 149 § 150 (Count V), and relief pursuant to 28 U.S.C. § 2201 (the Declaratory Judgment Act) (Count VI).  See FAC ¶¶ 35-68.  For the reasons that follow below, this court finds that Ms. Crowe has made a *prima facie* showing of personal jurisdiction over the Agency and Mr. Klinger.  Accordingly, the motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(2) is DENIED.

A.  **Personal Jurisdiction – Generally**

In order to exercise personal jurisdiction over each defendant, the court must "find sufficient contacts between the defendant and the forum to satisfy both that state's long-arm statute and the Fourteenth Amendment's Due Process clause."  Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995).  The First Circuit has treated the "limits of Massachusetts's long-arm statute as coextensive with those of the Due Process Clause."  Copia Commc'ns, LLC v. AMResorts, L.P., 812 F.3d 1, 4 (1st Cir. 2016).  In such cases, the court has been able to "sidestep the statutory inquiry and proceed directly to the constitutional analysis[.]"  Daynard, 290 F.3d at 52.[2]  Under the Due Process Clause, a court may exercise personal jurisdiction "over an out-of-state defendant only if that defendant has 'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and

---

[2] The court notes that recently, the First Circuit has "suggested that Massachusetts's long-arm statute might impose more restrictive limits on the exercise of personal jurisdiction than does the Constitution." Copia Commc'ns, 812 F.3d at 4 (decided Jan. 13, 2016).  More recently, however, the Massachusetts Appeals Court continued to follow Supreme Judicial Court precedent holding that the Massachusetts long-arm statute allows for "an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States," and thus analyzed only the constitutional limits of personal jurisdiction. OpenRisk, LLC v. Roston, 90 Mass. App. Ct. 1107, 59 N.E.3d 456 (Table), No. 15-P-1282, 2016 WL 5596005, at *4 (Sept. 29, 2016) (citing "Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp., 361 Mass. 441, 443 (1972)).  In light of the Massachusetts precedent on this issue, this court "sidestep[s] the statutory inquiry and proceed[s] directly to the constitutional analysis[.]" Daynard, 290 F.3d at 52.

substantial justice.'" <u>Copia Commc'ns</u>, 812 F.3d at 4 (quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945)) (alteration in original; additional quotations and citation omitted). Accordingly, "[t]he accepted mode of analysis for questions involving personal jurisdiction concentrates on the quality and quantity of the potential defendant's contacts with the forum." <u>Phillips Exeter Acad. v. Howard Phillips Fund, Inc</u>., 196 F.3d 284, 288 (1st Cir. 1999). "Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant *himself* that create a substantial connection with the forum State." <u>Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal., Solano Cty.</u>, 480 U.S. 102, 109, 107 S. Ct. 1026, 1030, 94 L. Ed. 2d 92 (1987) (punctuation and emphasis in original; internal quotation marks and citations omitted).

"Personal jurisdiction may be either general or specific." <u>Cossaboon v. Maine Med. Ctr.</u>, 600 F.3d 25, 31 (1st Cir. 2010). "General jurisdiction broadly subjects the defendant to suit in the forum state's courts 'in respect to all matters, even those that are unrelated to the defendant's contacts with the forum.'" <u>Id.</u> (quoting <u>Phillips Exeter Acad.</u>, 196 F.3d at 288). Specific jurisdiction exists "where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." <u>Id.</u> (quoting <u>Pritzker v. Yari</u>, 42 F.3d 53, 60 (1st Cir. 1994), cert. denied, 514 U.S. 1108, 115 S. Ct. 1959, 131 L. Ed. 2d 851 (1995).

In the instant case, Ms. Crowe asserts that the defendants have minimum contacts with Massachusetts to satisfy the Due Process Clause of the Fourteenth Amendment, claiming that both general and specific jurisdiction exists. As this court finds that it has specific jurisdiction over the defendants, it need not reach the question of general jurisdiction. <u>See</u> <u>Harlow v.</u>

Children's Hosp.  432 F.3d 50, 57 (1st Cir. 2005) ("The plaintiff need not prove the existence of both types of jurisdiction; either one, standing alone, is sufficient.").

**B.    Specific Jurisdiction Analysis**

For purposes of the specific jurisdiction analysis, the First Circuit has "broken the minimum contacts analysis into three categories—relatedness, purposeful availment, and reasonableness[.]"  Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007).  Thus, as the Court has explained:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities.  Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable.  Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

Id. (quoting Daynard, 290 F.3d at 60) (additional citation omitted).  "An affirmative finding on each of the three elements of the test is required to support a finding of specific jurisdiction."  Phillips Exeter Acad., 196 F.3d at 288.  As detailed below, the plaintiff has met her burden of establishing both relatedness and purposeful availment.  Moreover, the application of the Gestalt factors to the facts of this case compels the conclusion that this court's assertion of personal jurisdiction over the defendants is reasonable.

**Relatedness**

The relatedness inquiry "is to be resolved under 'a flexible, relaxed standard.'"  Baskin-Robbins Franchising LLC, 825 F.3d at 35 (quoting Pritzker, 42 F.3d at 61).  In evaluating relatedness, the court is mindful that "[q]uestions of specific jurisdiction are always tied to the particular claims asserted."  Phillips Exeter Acad., 196 F.3d at 289.  "[T]he defendant's in-state

conduct must form an important, or at least material, element of proof in the plaintiff's case." Phillips v. Prairie Eye Ctr., 530 F.3d 22, 27 (1st Cir. 2008) (quoting Harlow, 432 F.3d at 61) (internal quotation omitted).  In the instant case, Ms. Crowe has asserted claims in contract.  In contract cases, the court must determine "whether the defendant's activity in the forum state was instrumental either in the formation of the contract or its breach."  Id. (internal quotation and citation omitted).  It is appropriate to "pay particularly close attention to 'the parties' prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" Cossart v. United Excel Corp., 804 F.3d 13, 20 (1st Cir. 2015) (quoting C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 66 (1st Cir. 2014)).  Plaintiff may satisfy the relatedness requirement when the evidence shows that the defendants had "an ongoing connection with Massachusetts in the performance under the contract[,]" and that plaintiff's claims arose "from the alleged breach of that contract."  C.W. Downer, 771 F.3d at 66.

Plaintiff's claims arise from her allegation that defendants failed to pay her commission in violation of her oral employment agreement.  Thus, in this case, "to determine relatedness, we must consider the contacts between the defendants and the forum state viewed through the prism of plaintiff's . . . claim for unpaid compensation[.]"  Cossart, 804 F.3d at 20 (internal citation and quotation omitted).  While Mr. Klinger initially negotiated and entered into the employment agreement with Ms. Crowe in New York, it was amended in 2015 to allow Ms. Crowe to work from Massachusetts.  Moreover, after Ms. Crowe moved to Massachusetts, she was paid for work performed in Massachusetts by checks sent to Massachusetts.  This case involved an alleged breach of "the contract defendants procured with a Massachusetts resident

to be performed by the resident primarily from Massachusetts." <u>Cossart</u>, 804 F.3d at 20. The defendants continued Ms. Crowe's employment with the Agency "with full knowledge that [Ms. Crowe] would perform [her] duties from Massachusetts." <u>Id.</u> at 20-21. And "when [the Agency] refused to pay the commission that was allegedly due," Ms. Crowe was based in the Commonwealth and was working from the Commonwealth. <u>Id.</u> at 70. This is sufficient to satisfy the relatedness requirement of the purposeful availment analysis. <u>Id.</u> (in a claim for unpaid commissions, Massachusetts court had personal jurisdiction over a Kansas company who permitted its employee to work out of Massachusetts).

Moreover, the Agency and Mr. Klinger had continuous contacts with Massachusetts throughout the course of Ms. Crowe's employment from Massachusetts — "the evidence of contacts during the course of dealing is powerful." <u>C.W. Downer & Co.</u>, 771 F.3d at 66. As detailed above, Ms. Crowe did extensive work in Massachusetts on behalf of the Agency, and Mr. Klinger was in frequent communication with her over all aspects of their work while she was in Massachusetts. The "ongoing connection with Massachusetts in the performance under the contract" "is enough to establish relatedness" where, as here, the plaintiff's claims "arise from the alleged breach of that contract." <u>Id.</u> (Massachusetts court had personal jurisdiction over Canadian company in suit by Massachusetts investment bank alleging breach of contract by the foreign company).

### Purposeful Availment

Plaintiff also has put forth evidence of the defendants' contacts with Massachusetts sufficient to fulfill the purposeful availment prong of the jurisdictional inquiry. "The purposeful availment inquiry . . . focuses on the defendant's intentionality. This prong is only satisfied

when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." Swiss Am. Bank, Ltd., 274 F.3d at 623-24 (internal citation omitted). Accordingly, purposeful availment occurs "when a defendant deliberately targets its behavior toward the society or economy of a particular forum [such that] the forum should have the power to subject the defendant to judgment regarding that behavior." Carreras v. PMG Collins, LLC, 660 F.3d 549, 555 (1st. Cir. 2011) (citing J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 881, 131 S. Ct. 2780, 2787-88, 180 L. Ed. 2d 765 (2011)). "The enforcement of personal jurisdiction over a non-resident defendant is foreseeable when that defendant has established a continuing obligation between itself and the forum state." Sawtelle, 70 F.3d at 1393.

Defendants voluntarily established a continuing obligation between themselves and Massachusetts when the Agency, through Mr. Klinger, agreed that Ms. Crowe would work full-time for the Agency in Massachusetts. Though it was Ms. Crowe who proposed this arrange-ment, the Agency, through Mr. Klinger, voluntarily agreed to it, and elected not to terminate their relationship. As Mr. Klinger acknowledged, at the time she moved to Massachusetts, Ms. Crowe "was a key and trusted employee of the corporate defendant with nearly exclusive responsibility for our children's authors." (Klinger Decl. ¶ 12). The fact that the parties decided to continue their employment relationship knowing that Ms. Crowe would be working full-time for the Agency in Massachusetts satisfies the purposeful availment requirement of the personal jurisdiction analysis. See Cossart, 804 F.3d at 21 n.3 (purposeful availment may be found where defendants "reasonably foresee" the plaintiff's performance of the contract from Massachusetts). See also Dorney v. Pindrop Sec., Inc., 15-CV-11505-ADB, 2015 WL 5680333, at

*4 (D. Mass. Sept. 25, 2015) (purposeful availment found where corporate defendant entered into an employment agreement with plaintiff knowing plaintiff would work from Massachusetts even though there was "no requirement that [plaintiff] reside in or conduct his employment duties from Massachusetts, and no expectation he would develop business there").

### Mr. Klinger

With respect to Mr. Klinger, there is evidence, as detailed above, that he has worked in Massachusetts and owns property in the Commonwealth.  However, this court may exert personal jurisdiction over him for a more basic reason.  "[P]recedent supports subjecting corporate officers to jurisdiction under the long-arm statute at least where they are 'primary participants' in corporate action as [Mr. Klinger] was", and the First Circuit has applied this reasoning to the constitutional analysis as well.  Cossart, 804 F.3d at 19, 20-22, and cases cited.

### Gestalt Factors

The third step of the specific jurisdiction analysis is for the court to determine whether the exercise of personal jurisdiction is reasonable in light of the so-called "Gestalt factors." Sawtelle, 70 F.3d at 1394.  This requires the court to consider "(1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies."  Id.  "The[] gestalt factors are designed to put into sharper perspective the reasonableness and fundamental fairness of exercising jurisdiction in particular situations."  Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994) (citing Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 210 (1st Cir. 1994)).  "The purpose of the gestalt factors is to aid

the court in achieving substantial justice, particularly where the minimum contacts question is very close.  In such cases, the gestalt factors may tip the constitutional balance." Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 717 (1st Cir. 1996) (internal quotation and citation omitted).

On balance, the application of the Gestalt factors to the facts of this case weighs in favor of exercising personal jurisdiction over the defendants.  With respect to the first factor — the defendant's burden of appearing, this court finds that the burden on the Agency and Mr. Klinger would not be significant.  Although the need to defend an action in a foreign jurisdiction "is almost always inconvenient and/or costly . . . this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." Pritzker, 42 F.3d at 64 (noting that modern travel "creates no especially ponderous burden for business travelers").  Here, defendants assert no special burden they would encounter in litigation out of state, nor could they credibly do so given the fact that Mr. Klinger has done work as an agent in Massachusetts and owns a vacation home here.  While defendants argue that the various witnesses for the defense are located outside of Massachusetts, this burden is neither "special" nor "unusual." See C.W. Downer, 771 F.3d at 70 (noting that "[m]ounting an out-of-state defense most always means added trouble and cost" and that "most logistical challenges can be resolved through the use of affidavits and video devices") (internal citation and quotation omitted). Accord Hasbro, Inc. v. Clue Computing, Inc., 994 F. Supp. 34, 45 (D. Mass. 1997).

The second Gestalt factor, concerning the forum state's interest in adjudicating the dispute, weighs heavily in favor of keeping the lawsuit in Massachusetts.  "Massachusetts clearly has an interest in being the forum that determines whether [plaintiff], who performed [her] work for the company in the Commonwealth, has a meritorious claim under the

Massachusetts Wage Act." Cossart, 804 F.3d at 22. See also Dorney, 2015 WL 5680333 at *4 ("Massachusetts has an interest in providing a convenient and effective forum in which its citizens may resolve disputes with their corporate employers, especially when the dispute may implicate Massachusetts law.").

In opposition to this interest, defendants argue that if the court were to find that New York State labor laws apply in this case, the court might be faced with a matter of first impression under New York law. However, this court is capable of applying the laws of other fora. See C.W. Downer, 771 F.3d at 70-71 (where defendant argued that case presented a matter of first impression under Saskatchewan law, court saw "no injustice" in having a Massachusetts court adjudicate the claim because "federal district courts are in the regular practice of applying laws of other fora") (internal quotation omitted). Furthermore, "[t]he purpose of [this] inquiry is not to *compare* the forum's interest to that of some other jurisdiction, but to determine the extent to which the forum *has* an interest." Sawtelle, 70 F.3d at 1395 (internal quotation and citation omitted) (emphasis in the original). See also C.W. Downer & Co, 771 F.3d at 70 n.6 (regardless of which jurisdiction's law governs the contract, "the interests in providing a forum are independent of the substantive law applied by the forum"). This second factor weighs heavily in favor of keeping the lawsuit in Massachusetts.

The third Gestalt factor is the plaintiff's interest in obtaining convenient and effective relief. The First Circuit has repeatedly observed that "a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." Sawtelle, 70 F.3d at 1395. Here, it would be more convenient for Ms. Crowe to litigate her claims in the

forum in which she resides.  See id.  Consequently, the third Gestalt factor weighs heavily in favor of exercising jurisdiction.

The fourth Gestalt factor, concerning the judicial system's interest in obtaining the most effective resolution of this case, is generally considered "a wash."  Baskin-Robbins, 825 F.3d at 41 (citing Sawtelle, 70 F.3d at 1395).  "Even though Massachusetts courts can effectively administer justice in this dispute, they have no corner on the market."  Id.  Thus, this factor is neutral.  This court does note that there is a lawsuit filed in federal court in New York involving this matter, and thus, there is "at least a question as to whether the instant lawsuit serves the interstate judicial system's interest in efficient resolution."  Bluetarp Fin., Inc. v. Matrix Constr. Co., Inc., 709 F.3d 72, 83 (1st Cir. 2013).  However, as detailed below in connection with the defendants' request to transfer this case, there is ample reason for the case to go forward in Massachusetts.  Therefore, this fact "is insufficient to tip the constitutional balance."  Id.

The final factor concerns the interests of the affected states in promoting substantive social policies.  As noted earlier, Massachusetts has a clear interest in affording its citizens a convenient forum in which to bring their employment claims.  On the other hand, New York has an interest in adjudicating claims relating to corporate employers within its borders.  Therefore, this factor does not weigh in favor of one forum over another.

In sum although it may be somewhat inconvenient for the Agency and Mr. Klinger to defend this case in Massachusetts, the inconvenience is not significant.  Moreover, where the remaining Gestalt factors relevant to this case weigh in favor of jurisdiction or are neutral, the maintenance of the lawsuit against defendants in Massachusetts "would comport with 'fair play and substantial justice.'"  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476, 105 S.Ct. 2174,

2184, 85 L. Ed. 2d 528 (1985) (quoting Int'l Shoe Co., 326 U.S. at 320, 66 S. Ct. at 160).  For all

these reasons, this court finds that it has personal jurisdiction over the defendants, and the

defendants' motion to dismiss for lack of personal jurisdiction is DENIED.

     **C.**     **Motion for Transfer**

     Defendants argue that even if this court concludes that the exercise of jurisdiction in

Massachusetts is proper, it should transfer this action to the federal District Court for the

Southern District of New York pursuant to 28 U.S.C. § 1404 on the basis of *forum non*

*conveniens*.  "Under § 1404(a), a district court may transfer any civil action to any other district

where it may have been brought '[f]or the convenience of parties and witnesses, in the interest

of justice.'"  Coady v. Ashcraft & Gerel, 223 F.3d 1, 11 (1st Cir. 2000) (quoting 28 U.S.C. §

1404(a)).  However, this court finds that transfer is not appropriate.

     "Section 1404(a) is intended to place discretion in the district court to adjudicate

motions for transfer according to an 'individualized, case-by-case consideration of convenience

and fairness.'"  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 108 S. Ct. 2239, 2244, 101 L.

Ed. 2d 22 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622, 84 S. Ct. 805, 812, 11 L. Ed.

2d 945 (1964)).  "Factors to be considered by the district court in making its determination

include the convenience of the parties and witnesses . . ., the availability of documents, and the

possibilities of consolidation."  Cianbro Corp. v. Curran–Lavoie, Inc., 814 F.2d 7, 11 (1st Cir.

1987).  "Where identical actions are proceeding concurrently in two federal courts . . . the first

filed action is generally preferred in a choice-of-venue decision."  Coady, 223 F.3d at 11

(internal quotations and citation omitted).  The burden of demonstrating that transfer is

appropriate "rests with the party seeking transfer; there is a strong presumption in favor of the

plaintiff's choice of forum." Id.  This presumption, as well as a review of the relevant factors in this case, supports denial of the defendants' motion.

Here, though an adequate alternative forum exists, considerations of convenience and judicial efficiency do not sufficiently favor litigating the claim elsewhere.  Discovery has proceeded in this matter in both Massachusetts and New York since this motion was filed.  History has proven that the distance between New York and Massachusetts is not so large as to pose any meaningful inconvenience in this matter.  Moreover, it appears that there are potentially third party witnesses who reside neither in Massachusetts nor in New York.  The defendants have not identified any evidence that they will be precluded from presenting, either live, or through a video deposition or otherwise, if the matter remains in Massachusetts.

Finally, Massachusetts was the first-filed action and "the first filed action is generally preferred in a choice-of-venue decision."  Id. (internal quotation omitted).[3]

In sum, defendants have not met their heavy burden of establishing that transfer of the instant case to New York is appropriate over the plaintiff's objection, and the defendants' motion to transfer is DENIED.

### IV.  CONCLUSION

For all the reasons set forth herein, "Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue and Forum Non Conveniens" (Docket No. 40) is DENIED.

---

[3] While the defendants contend that plaintiff's counsel misled defense counsel into delaying filing an action against plaintiff in New York by asserting that plaintiff needed time to consider defendants' settlement offer, there is no evidence that plaintiff breached an agreement not to file suit.  (See Klinger Reply Decl. ¶¶ 12-18, Ex. 1).  Moreover, Massachusetts was a logical forum for the plaintiff to litigate. See The Holmes Group, Inc. v. Hamilton Beach/Proctor Silex, Inc., 249 F. Supp. 2d 12, 18 (D. Mass. 2002) ("Where a plaintiff chooses [her] home forum, such a choice usually represents considerations of convenience rather than harassment of the defendant").

/ s / Judith Gail Dein
_____
Judith Gail Dein
United States Magistrate Judge