UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SARA CROWE, <br>      Plaintiff/Defendant in the Counterclaim, <br><br> v. <br><br> HARVEY KLINGER, INC. and <br> HARVEY KLINGER, <br>      Defendant/Plaintiff in the Counterclaim. | Case No. 16-12033-JGD |

## SARA CROWE'S PROPOSED FINDINGS OF FACT
## AND RULINGS OF LAW

Sara Crowe, the Plaintiff/Defendant in the Counterclaim, respectively submits the following proposed findings of fact and rulings of law in the above referenced matter:

1.  Sara Crowe began working for Harvey Klinger, Inc. ("Klinger" or "Agency") as a literary agent in February 2005.  (R. pp. 30-31).  She did not enter into a written employment contract or an agreement not to compete.  (R. p. 31).

2.  As a literary agent Crowe represents authors and illustrators in their book deals with publishers. She fields inquiries from authors, edits the manuscripts with them, sells the books to publishers and manages their careers.   (R. pp. 31-32).

3.  When Crowe joined Klinger, Inc. she brought approximately ten adult and children's fiction authors with her.  (R. p. 31).

4.  Over time, Crowe began to focus her efforts on children's books.  (R. p. 33).

5.  Crowe was paid by a combined draw and commission until February 2014.  (R. p. 34).

6.  In February 2014, Crowe requested a telephone call with Harvey Klinger, the owner of the agency, to discuss her desire to change to a commission's only salary structure.  (R. p. 36).

During that telephone call Mr. Klinger offered her a commission only structure at a split of 60/40, but without the draw she had been receiving. Because Crowe was, at that time, exceeding her draw and already receiving a split of 60/40 on her commissions, Klinger's offer represented a risk of a decrease in her salary. As a result, Crowe requested a second call to discuss the matter further the following day. (R. pp. 36-37).

7. The next day, during the follow-up call with Klinger, Crowe pressed for a 70/30 split and a continuation of her commissions following the termination of her employment. Crowe was concerned about the financial security of her family going forward and needed to know that should Mr. Klinger retire or close the agency, or should she leave, she would still receive her commissions. (R. p. 37). Crowe had been putting her own money into her work for the agency and requested that Mr. Klinger put their agreement in writing for her personal security. (R. p. 42).

8. When Crowe made her request, Klinger was spending November through April in Florida and July through Labor Day in Maine. He was only in the office for approximately 4 months per year for 3-4 days a week. (R. p. 45).

9. Mr. Klinger agreed to Crowe's proposal, but when she requested that he reduce the agreement to writing, he responded by telling her that, "there was no need for an agreement and that, you know, I was in any future plans for the agency and that he had no plans to retire." (R. p. 38).

10. Crowe and Klinger also agreed to make the 70/30 commission structure retroactive to January 1, 2014. The adjustment was made and the parties moved forward under the agreed upon commission split of 70/30. (R. pp. 38-39). Neither party documented their agreement in writing.

11. Following her telephone calls with Mr. Klinger, Crowe understood that each of them would keep their commissions in the event of a change at the agency or she left the agency. (R. p. 38). The only matter left unresolved was her request for a written agreement. (R. p. 39).

12. In October 2015, Crowe's payment schedule was changed, at her request, from monthly to bi-weekly. (R. pp. 39-41, Exh. 1). Thereafter she was paid at mid-month and the end of the month for the two week period immediately preceding the payment. (R. p. 41).

13. Although there were some occasions when Crowe would not receive her check until 4 or 5 business days after the Friday that ended the pay period, Crowe was typically paid on the Monday or Tuesday immediately following the Friday that ended of the preceding pay period. (Exh. 74).

14. During the period of Crowe's employment at the agency, Klinger never initiated a performance review or a pay increase. (R. p. 42).

15. Crowe's commissions were paid when the payments were received on contracts that were signed with publishers. (R. p. 45). She never received commissions based upon an offer. (R. p. 45).

16. The agency received a commission equal to 15% of the revenue received from the publisher on advances and royalties paid under the publishing contracts with Crowe's authors. She received 70% of that 15% and the agency retained 30%. (R. p. 46).

17. Crowe moved from New York to Massachusetts in June 2015. In the year following her move, Crowe travelled from Massachusetts to New York on three occasions for approximately 6 days each, but not all of those days were office days. (R. p. 45). While living and working in Massachusetts, Crowe attended work-related conferences in

Massachusetts and met with editors at publishers located within the Commonwealth.  (R. pp. 47-48).

18. Crowe last requested that Klinger put the commission agreement in writing following her return from a book fair in Bologna in May or June 2016.  Crowe was concerned because Dave Dunton, the person who handled the payments and managed the accounting, was planning a move to Hawaii and Crowe had just incurred large expenses in connection with her trip to Bologna.  (R. pp. 48-49).

<u>Problems With Salary Payments And Paystubs</u>

19. During the course of her employment at Klinger, Inc., Crowe experienced a number of problems receiving the commission payments due her.  Klinger refused to use direct deposit and the method he ultimately used to pay his employees, Chase QuickPay, had daily limits that often meant Klinger had to send Crowe a portion of her payment via QuickPay one day and the rest on another day.  (R. p. 50, Exh. 2).

20. Although there were a few exceptions, Crowe did not typically receive paystubs with her checks.  Her checks varied depending on the revenues generated during the pay period and were paid net of deductions so it was difficult for Crowe to figure out what she was being paid for without a paystub.  (R. p. 51).

21. Although Crowe did receive a copy of the statements sent to her authors those statements did not always coincide with her pay periods.  (R. pp. 51-52, R. pp. 2:10-21, Exh. 3).  While she could calculate her share of the commission before deductions from the fees the agency retained as per the author's statements, it was difficult for her to keep track of which checks counted for which months.  (R. p. 53, Exh. 4).  She had continuing difficulties even calculating her gross salary due to Klinger's failure to provide her with necessary

information.  (R. p. 60, Exh. 8).  In short, it was left to Crowe to reconcile the amounts that were received by the author and to calculate her commission.  (R. p. 2:21).

22. Crowe didn't know what her deductions were because she wasn't receiving her paystubs.  (R. p. 54).  In fact, she could not recall ever receiving a paystub with a payment.  (R. p. 55). When she did receive her paystubs she would usually get them, not with the check she received, but with the following check or she would receive a couple of paystubs at the same time.  (R. p. 55).

23. Klinger was apparently receiving the stubs at some point, but didn't provide them to Crowe and didn't save them.  (R. p. 57, Exh. 5).

24. Following her move to Massachusetts Crowe continued to experience difficulty getting her paystubs.  (R. p. 58, Exh. 6).

<u>Difficulties With Payments To Crowe's Authors</u>

25. As Crowe's list of authors grew longer, problems with payments and tax forms increased. (R. p. 61).

26. For example, Klinger forgot to sign a $48,000 check to one of Crowe's authors and the agency sent them incorrect or inaccurate 1099 tax forms.  (R. pp. 61-65, 68, Exhs. 9, 10, 13).

27. Klinger also forgot to send one of Crowe's authors a check resulting in a several week delay in payment.  (R. pp. 62-66, 70, Exhs. 11, 15).   On yet other occasions he sent the checks to the wrong addresses.  (R. pp. 69, 71, Exhs. 14 &16).

28. Klinger was also rude to one of Crowe's biggest clients in response to that author's inquiry about problems with his 1099.  (R. pp. 66-68).

29. Difficulties with payments to Crowe and her authors continued after she left the agency.  (R. p. 71).

Crowe's Interaction With The Pippen Agency During The Course Of Her
Employment At Klinger, Inc.

30. In May 2016, Crowe received an email invitation to lunch from Holly McGhee, the owner of

Pippin Properties, a children's book literary agency in New York.  (R. pp. 72-73, Exh. 17).

McGhee was not aware that Crowe had moved to Boston almost a year earlier.  (R. p. 73).

31. McGhee's email coincided with Crowe's continuing concerns about the above-described

payment problems coupled with the added concern that Mr. Klinger might close the agency

as three of the agents would soon be working either full-time or part-time from out-of-state

locations.  (R. p. 74).  Crowe responded to the email and they settled on a date for lunch.  (R.

p. 73).

32. Immediately after the June 2016 lunch, Crowe visited the Pippen offices.  The offices were

beautiful.  (R. pp. 74-75).  Following the lunch, Crowe sent McGhee a list of the projects she

sold while she was at Klinger.  Klinger is still receiving his commissions on those projects.

(R. pp. 75-76, Exh. 19).

33. On June 22, 2016, Holly McGhee sent an email invitation to Crowe to meet some of the

other agents at Pippen. (R. p. 78, Exh. 20).  A follow-up lunch was scheduled, via email, for

August 23, 2016.  (R. p. 79, Exh. 21).

34. The lunch on August 23, 2016 took place while Crowe was on vacation and went very well.

(R. pp. 80-81, Exh. 22).  Crowe was excited about the potential of joining Pippen as it was

the most prestigious children's agency and could offer her the support she believed she

needed for her authors.  (R. p. 80).  She informed Pippen by email on August 24, 2016 that

she was grateful to be considered for a position with Pippen.  (Exh. 22).

35. In a follow-up telephone call and email, McGhee and Crowe discussed her potential

employment and Crowe provided McGhee with a summary of various deals for her authors.

(R. pp. 82-83).

36. In an email Crowe sent to McGhee, under the moniker "Deals Just Made" Crowe listed 4

projects. (Exh. 23). The timelines of those deals are summarized in the chart appearing

below:

| Book Title/ Author | Value of Contract | Stage at Klinger, Inc. | Date Draft of Contract First Received | Date Deal Closed |
|---|---|---|---|---|
| Confidential American Girl<br><br>Varian Johnson | $15,000 | Fee had been proposed, some details & delivery schedule had not been agreed upon. (R. p. 83) | 10/20/16 (R. p. 86, Exh. 44) | After 11/15/16. (R. p. 86, Exh. 45) |
| Folded Notes From High School<br><br>Matthew Boren | $25,000 | Agreed on Fee and on some changes but not on all details. (R. p. 84) | 10/6/16 (R. p. 88, Exh. 47) | 1/ 9/17 (R. p. 87, Exh. 46) |
| Tangled<br><br>Leila Howland | $40,000 | Had discussed fee but needed permission of Harper Collins to do it. (R. p. 90) | 9/29/16 (R. p. 90, Exh. 49) | 10/6/16 (R. p. 91, Exh. 48) |
| Brawlers<br><br>Neil Connelly | $10,000 | Fee Discussed. (R. p. 93) | 9/12/16 (R. p. 92, Exh. 50) | Mid October. (R. p. 93) |

37. The timelines for the deals described in Exhibit 23, as "Clients who will make new deals this

year" are summarized in the chart appearing below:

| Book Title/ Author | Stage at Klinger, Inc. | Date of First Contact w/ Publisher | Date Deal Closed |
|---|---|---|---|
| Polaris Thin Ice Days (Exhs. 52, 53)<br><br>Michael Northrop | Waiting for an offer (R. p. 111, Exh. 23) | 11/14/16 (R. pp. 98-99, Exh. 44) | 05/24/17. (R. p. 99, Exh. 53) |
| Hello Universe You Go First<br><br>Erin Entrada Kelly | Deal made at Klinger; Klinger receiving commissions. (R. p. 99) | N/A | N/A |
| Starry Night<br><br>Lisa Schroeder | Talked to editor about what her next series might be  (R. p. 100, 111) | 10/28/16 (R. p. 90, Exh. 56) | 01/11/17 (R. p. 100, Exh. 55) |
| Dan Wells YA | Deal never happened | No Deal Made | No Deal Made |
| Debut Middle Grade | Deal never happened  (R. p. 101) | No Deal Made (R. p. 101) | No Deal Made (R. p. 101) |
| Leila Howland, both MG and YA | Deal never happened. (R. p. 101) | No Deal Made (R. p. 102) | No Deal Made (R. p. 102) |
| Varian Johnson | Deal never happened. (R. p. 102) | No Deal Made (R. p. 102) | No Deal Made (R. p. 102) |
| Peggy Edelman | Deal never happened. (R. pp. 105-106) | No Deal Made (R. pp. 105-106) | No Deal Made (R. pp. 105-106) |
| Water Bears<br><br>Kim Baker |  | 05/21/2018 (R. p. 106, Exh. 59) | No contract as of trial. |
| Kim Savage proposals with FSG | Bouncing around ideas with her editors. (R. p. 107) | Proposal sent in October 2016 |  |
| Carrie Firestone | Deal never happened. (R. p. 108) | No Deal Made (R. p. 108) | No Deal Made (R. p. 108) |
| Diane Salerni | Deal never happened. (R. p. 108) | No Deal Made (R. p. 108) | No Deal Made (R. p. 108) |

| | | | |
|---|---|---|---|
| Dori Butler, New Chapter Book Series | Deal never happened. (R. p. 109) | No Deal Made (R. p. 109) | No Deal Made (R. p. 109) |
| Hirandandani | Deal never happened. (R. p. 110) | No Deal Made (R. p. 110) | No Deal Made (R. p. 110) |

38. The Commissions for Dori Butler's books nine and ten are being held by the publisher pending the outcome of the litigation. (R. p. 112, Exh. 64). With respect to that deal, Crowe had personally paid a lawyer to prepare the contract while she was still at Klinger. Butler wanted the contract to be a Pippen contract. (R. pp. 113, 125-126, Exh. 64). Neither Klinger nor Crowe are receiving the commissions due on that contract. (R. pp. 113-114).

39. The commissions for Kristina Perez's Sweet Black Waves are also being held by the publisher. (R. pp. 114, 126, Exh. 65). That contract was dated February 8, 2017. (R. p. 114).

40. Crowe had not received a deal memo for Tangled as of the date of her resignation. Some publishers do deal memos, some do not. (R. p. 2:8).

41. A deal memo is used to "nail down" what has been agreed to before the contract stage. At that stage you are "hopeful", "it could change", "it definitely feels like you have…a deal" but you don't have "a contract signed yet." (R. p. 2:10).

42. Leila Howland, the author of Tangled, was willing to do the book if her primary publisher was agreeable. (R. p. 2:8). Howland had not written a manuscript. As a result, unlike the case where the publisher was purchasing the rights to an existing manuscript, the publisher for Tangled had the right to deem the manuscript unacceptable and to cancel the contract. (R. p. 2:9-10). The author wrote the book in four weeks and ultimately delivered it in March of 2017. (R. p. 2:12).

43. Crowe had received a deal memo for Matt Boren but that deal memo became completely moot as "they completely renegotiated the deal." (R. p. 2:11).

44. The publisher for the Varian Johnson American Girl work for hire had offered $15,000.00 but Johnson had not yet decided whether he was going to do it. (R. p. 2:12). Johnson had already rejected two other work for hire offers this year. (R. p. 2:12).

45. Crowe had an offer for Brawlers by Neil Connolly and discussions had started. (R. p. 2:14).

46. Crowe did not have a willing buyer for Lisa Schroeder's Starry Night, for Leila Howland's Tangled 2, or for Jonathan Mayberry's Broken Lens. (R. pp. 2:14-15).

47. Harvey Klinger believed that the Agency was entitled to a commission when the author and publisher have agreed to a lot of the basic terms. (R. pp. 2:84-86).

48. The author always has the final say on whether to agree to terms with a publisher. (R. p. 2:89).

49. According to Klinger's ballpark estimation, Crowe took sales that would have resulted in $36,000 in commissions to the agency, comprising of the Leila Howland "Tangled" deal, Matt Boren's Folded Notes, Varian Johnson's Spirit Animals and American Girl, Neil Connolly's Brawlers and perhaps Michael Northrup which was not included in his number. (R. pp. 2:107-109). Lisa Schroeder's Starry Nights, Erin Entrada Kelly and Kim Savage had not yet reached a stage that would entitle Klinger to commissions. (R. pp. 2:139, 2:141).

50. Klinger acknowledged that he has been receiving his 30% share of the commission on all deals closed at the Agency even though Crowe has continued to service the Authors. (R. p. 2:135).

Lack Of Proof Regarding Contracts Between Crowe's Authors And The Klinger Agency.

51. Although some of Crowe's authors may have had contracts with the Klinger Agency, she did not know who did and who did not. She was unable to retrieve them from the Klinger offices when she realized that she did not have them in her possession. (R. p. 115).

52. Klinger did not know whether Crowe used the standard Klinger contract with any of the six authors whose commissions were at issue in the case. (R. p. 2:83). He did not insist on Agency contracts with the authors. (R. p. 87).

53. In any event, Klinger made no attempt to retain Crowe's authors for the Klinger agency. It would have been pointless as it was a foregone conclusion that her authors would follow her to Pippen. (R. p. 2:136).

Crowe's Personal, Financial Investment In Her Authors While At Klinger

54. Between 2011 and 2016, Crowe also spent approximately $7,000 on a personal website that was linked to the Klinger, Inc. website because the Klinger website was not competitive. Although Crowe brought authors into the agency through her website, Crowe never asked and Klinger never offered to reimburse her for the costs related to it. (R. pp. 77-78).

55. Crowe began using and paying an outside attorney to review and revise her contracts because Klinger did not have a system in place to assist her in quickly reviewing contracts when they came in. (R. p. 140).

56. During the spring before Crowe left Klinger, two large publishers merged and changed the boilerplate on their contracts. Crowe was concerned about a vague morals clause that had been added to the new boilerplate following the Paula Dean disclosures. (R. p. 141). While other agents were re-negotiating the language of the clause, Klinger had already signed a contract without making any changes. (R. pp. 140-141).

57. Crowe informed Klinger that she thought they should have a lawyer review the contracts. When Klinger declined Crowe hired a lawyer to re-negotiate the language of the clause for the publishing contracts with her authors. When he succeeded in doing so Crowe shared the new boilerplate with the other agents in the Klinger office. (R. pp. 141-142, Exh. 32).

58. Crowe paid $400 to the lawyer to renegotiate the language and $100 for each contract thereafter. (R. p. 143).

59. While Crowe was employed at Klinger, she paid the expenses related to travel and attendance at various workshops and book fairs. Although Klinger did pay for the cost of a table at one of the book fairs, he did not reimburse Crowe for the bulk of the costs as he did not view the book fairs as necessary to her duties. (R. pp. 137-139).

60. Crowe succeeded in bringing authors to the agency as a direct result of her attendance at book fairs. (R. p. 139). Those authors and the book fairs Crowe attended continue to generate revenue for the agency. (R. pp. 139-140).

61. By the time she left the Klinger Agency, Crowe was incurring between $7,000 and $12,000 per year in unreimbursed expenses. (R. p. 143).

<u>Post-Resignation Conduct</u>

62. Crowe resigned from the agency on September 8, 2016. (R. p. 116). After her resignation, she began calling her authors to inform them she was going to Pippen. She completed her calls over the weekend following her resignation. (R. p. 117, Exh. 25).

63. Shortly before she resigned, Crowe spoke with both a Massachusetts lawyer about Massachusetts wage laws and with a publishing lawyer in New York referred to her by Holly McGhee. (R. p. 118).

64. Crowe was hoping to move the open contracts for books not yet published from Klinger to Pippen so that Klinger's share of the commissions due on those contracts would be paid directly by the publisher.  (R. pp. 118-119, Exh. 26).  Moving those contracts to Pippen from Klinger would have meant that Klinger would have been doing less work administering the payments on those contracts while he would still receive payment for his share.  (R. p. 121).

65. Crowe's New York lawyer advised her that he was comfortable with her taking unsigned deals to Pippen, information that she passed on to Holly McGhee.  (R. p. 2:26; Exh. 24).

66. On or about August 10, 2016, prior to leaving the Klinger agency, Crowe received a proposed contract from Scholastic for Spirit Animals, a book by Varian Johnson.  (R. p. 123). Harvey Klinger was unaware of the deal and Crowe had yet to negotiate it.  (R. p. 122). Crowe began negotiating that contract on September 16, 2016, and closed the deal in November or December of 2016.  (R. p. 124).  That deal was worth $25,000.00.  (R. p. 125).

67. Crowe spoke with the editor referred to in Exhibit 27, after she resigned.  (R. p. 126).

68. Eric Rayman, the New York publishing attorney Crowe retained for her dealings with Harvey Klinger received an email from Klinger's attorney dated September 30, 2016.  That email was forwarded to Crowe the same day.  (R. p. 139, Exh. 68).

69. In that email, Klinger's attorney took the position that Crowe was a faithless servant and was not entitled to any commissions, "from the day she began soliciting Plaintiff's clients to move with her to her new firm."  (R. p. 130, Exh. 68).  Counsel also wrote, "However, to avoid the cost of litigation involving the writers, publishers, and her new employer, [Klinger] is willing to resolve this by allowing her to retain the right to sell the unsold foreign rights . . ."  Finally, counsel wrote, "my client will hold the check he was going to pay her under protest now."  (Exh. 68).

70. Klinger was aware of the content of the September 30 email and adopted it. (R. p. 2:123). The check referred to in the September 30 email as, "the check he was going to pay her" was a check for post-employment commissions that he put on hold because she was a "faithless servant." (R. pp. 2:123-124). Klinger's faithless servant claim was, at that time, based upon an assumption that Crowe had been soliciting clients to move to Pippin while she was still employed at Klinger. (R. pp. 2:124-125).

71. Crowe had not solicited any of her authors. (R. p. 131). She construed the email as a threat to sue her, her authors and her new employer and feared that she might lose both her new job and her writers. (R. p. 131).

72. Eric Rayman responded to the September 30 email from Klinger's counsel on October 5, 2016 and asked if he was available on Monday or early the next week to discuss the matter. (R. p. 134).

73. Crowe received her commissions for the period September 1 through September 9, 2016 on September 15. (Exh. 74).

74. Ordinarily, Crowe would have been paid her commissions for the balance of the first two weeks of September no later than September 20, 2016, for the last two weeks of September no later than October 4, 2016, and for the first two weeks of October on October 18, 2016. If Klinger had continued to pay her every two weeks following her departure, she would have been paid on September 27, October 4, and October 18, 2016. (Exh. 74).

75. When Crowe did not receive a check on September 20 or on October 4, counsel for Crowe filed a wage complaint with the Massachusetts Attorney General on October 5, 2016. (R. p. 134, Exh. 29). Crowe had not decided what she was going to do in response to Klinger's

accusations but it seemed clear to her that he was going to follow through on his threat to sue her, her new company or her writers, "or come after me in some way."  (R. p. 135).

76. When Crowe did not receive a commission payment following the filing of the wage complaint, she filed her Complaint for Declaratory Judgment in this court on October 10, 2016.  (R. p. 135).

77. Crowe did not receive her check during the week following her pay period ending on September 23, or during the week following her pay period ending on October 7.  (R. p. 2:50).

78. Crowe did not receive her first checks for post commission payments until October 19, 2016, eight days after Klinger received notice of the Complaint for Declaratory Judgment.  The checks were in the amount of $3,737.79 and $16,350.00.  (R. p. 135, Exhs. 30, 68).

79. Klinger stopped using Quickpay to pay Crowe when she left his employ.  (R. p. 137).

80. Klinger believed that Crowe first became a faithless servant on or about August 24 when she arrived at her arrangement with Pippen.  Before then he could not be sure.  (R. p. 2:143).

81. Klinger believed that Crowe was not entitled to post-termination commissions because he did not have an agreement with her to pay the commissions and because she was a faithless servant on August 24, 2016.  (R. pp. 2:144, 2:146).

82. Klinger believed that Crowe was a faithless servant because she went behind his back, conspired with Holly McGhee, lied to him and then wanted to take the disputed deals on her way out the door.  (R. pp. 2:144-145).

83. Klinger agreed that it wasn't at all unusual for an employee to earn a commission and not receive payment on that commission until sometime later because the revenues came in over time.  (R. p. 2:147).

84. Although Crowe felt that generally Klinger was honest in his dealings with her, he was

dishonest when dealing with salary negotiations and discussions.  (R. pp. 2:43, 2:46).  For

example, during one salary discussion he told Crowe that another agent in the office was

doing much better than her and that was not the case. (R. pp. 2:43-45).  On another occasion,

Klinger told Crowe that she just wasn't having any success even though she was exceeding

her draw and had added to the number of authors on her list.  (R. p. 2:45).

<div align="center">Rulings of Law</div>

Crowe's claims are predicated on Article 6 of New York Labor Law §§ 190, 191, and

§ 198 for the period prior to June 2015 when she moved to Massachusetts and The

Massachusetts Wage Act, ch 149, §§ 148-150 for the period commencing in June 2015 until

her resignation on September 8, 2016.  Klinger's counterclaim arises under the New York

Faithless Servant Rule ("FSR").

**1.   Article 6 of New York Labor Law Applies To The Period February 2005–June 2015.**

Crowe bears the burden of demonstrating that she was a commission salesman entitled

to the protection of Article 6 of the New York Labor Law ("NYLL").  Article 6 regulates the

payment of wages by employers to employees and applies to the period of time that Crowe

both worked and lived in New York.  *Patcher v. Bernard Hodes Group, Inc.,* 10 N.Y.3d 609,

614, 861 N.Y.S.2d 246, 891 N.E.2d 279 (2008); NYLL § 190 et seq; *see also Lauria v.*

*Heffernan,* 607 F.Supp.2d 403, 407 (E.D.N.Y. 2009).

In order to prevail on a claim pursuant to Article 6, "a plaintiff must first demonstrate

that he or she is an employee entitled to its protections." *Bierer v. Glaze, Inc.,* 2006 WL

2882569, at *9 (E.D.N.Y. Oct.6, 2006) (quoting *Bhanti v. Brookhaven Mem'l Hosp. Med.*

*Ctr., Inc.,* 260 A.D.2d 334, 335, 687 N.Y.S.2d 667 (2d Dep't 1999)); *Lauria,* 607 F.Supp.2d at 407 (same); NYLL § 190(2).

Section 190 of the Labor Law sets forth definitions that apply specifically and exclusively to Article 6. Subsection 190(2) defines an "employee" as "any person employed for hire by an employer in any employment." NYLL § 190(2). Subsection 190(3) in turn defines an "employer" to "include [ ] any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business, or service." *Id.* § 190(3). Section 190 thereafter defines "commission salesman" as a specific subcategory of employees to which the various provisions of Article 6 apply. *Id.* §§ 190(4)-(7). A "commission salesman" is defined as, "any employee whose principal activity is the selling of any goods, wares, merchandise, services, real estate, securities, insurance or any article or thing and whose earnings are based in whole or in part on commissions." *Id.* § 190(6). It does "not include an employee whose principal activity is of a supervisory, managerial, executive or administrative nature." *Id.*

Crowe's position is governed by NYLL § 191 because her primary job function was to acquire and maintain a stable of children's authors, she was responsible for generating revenue on a regular basis and she was paid commissions based on the revenue generated.

The evidence concerning the nature of Crowe's duties, her employment status and the fact that she was paid, commencing effective January 1, 2014 by commission only, was not disputed. Based on the evidence produced at trial, Crowe was a commission salesman, entitled to the protection of Article 6 during the period of time that she lived and worked in New York.

2.      **The Klinger's Violated New York Labor Law § 191(1)(c) When They Failed, Inter Alia, To Reduce The Commission Agreement With Crowe To Writing. The Failure To Do So Creates A Rebuttable Presumption In Favor Of Crowe's Understanding Of The Agreement.**

NYLL § 191(1)(c) requires that an employer provide a commissioned salesperson with (1) a written description of how commissions earned and payable shall be payable, (2) detail commissions payable in the event of termination, and (3) that the writing be signed by both the employer and employee.  Specifically NYLL §191(1)(c) provides in pertinent part, as follows:

> The agreed terms of employment shall be reduced to writing, signed by both the employer and the commission salesperson, kept on file by the employer for a period not less than three years and made available to the commissioner upon request. Such writing shall include a description of how wages, salary, drawing account, commissions and all other monies earned and payable shall be calculated. Where the writing provides for a recoverable draw, the frequency of reconciliation shall be included. Such writing shall also provide details pertinent to payment of wages, salary, drawing account, commissions and all other monies earned and payable in the case of termination of employment by either party. The failure of an employer to produce such written terms of employment, upon request of the commissioner, shall give rise to a presumption that the terms of employment that the commissioned salesperson has presented are the agreed terms of employment.

Klinger failed to comply with any of the above enumerated requirements of NYLL § 191(1)(c).  His failure to do so gives rise to the presumption that the terms presented by Crowe are the agreed terms of employment. NYLL § 191(1)(c) That is a presumption that Klinger failed to rebut.

Pursuant to Section 191(1)(c), a commission salesman is to be paid in accordance with the agreed upon terms of employment. Specifically, Section 191, entitled "Frequency of payments" provides in pertinent part, that:

> 1. Every employer shall pay wages in accordance with the following provisions: …

> (c) Commission salesman.—A commission salesman shall be paid the wages, salary, drawing account, commissions and all other monies earned or payable in accordance with the agreed terms of employment. . .

Klinger agreed to pay Crowe on a bi-weekly basis and did so until she resigned in September 2016. He made one timely payment immediately following her resignation but then, relying upon an assumption that Klinger admitted had no foundation in fact, held onto two checks due to her under protest before finally sending them to her on October 19, 2016, weeks after they were due even assuming that New York law applied to those payments. Since Massachusetts law applies to the timing of Crowe's post-termination payments, Klinger's violation of New York law as well is included only to demonstrate that Klinger's failure to pay Crowe in a timely manner was not as a result of a belief that New York law applied.

3.    **Klinger And Crowe Entered Into A Valid And Enforceable Oral Agreement For The Payment Of Commissions Under New York Labor Laws.**

Crowe contends the Klinger verbally agreed to continue to pay her share of commissions on deals she closed while at Klinger following her departure from the agency. Klinger denies entering into an agreement, oral or written, for payment of post-employment commissions. Nonetheless, both Klinger and Crowe agree that effective January 2014, while Crowe was still living and working in New York, they entered into an agreement according to which Crowe would be paid 70% of the revenues received by the agency and the agency would retain the remaining 30%.

Where a commission agreement is not reduced to writing, New York courts will look to the conduct of the parties for evidence of its terms. Neither Crowe nor Klinger wrote to confirm the change in Crowe's salary structure. Nonetheless, Crowe was thereafter paid in accordance with the terms of the agreement as Crowe described them and there was no attempt made to modify the split when Crowe moved to Massachusetts and asked that she be paid bi-weekly instead of monthly.

After the agreement was reached, Crowe made no plans to leave the agency. To the contrary, Crowe made considerable monetary investments in her practice. She paid for and maintained a website that linked to the agency site, she hired a lawyer to review her contracts at her own expense, and she paid out-of-pocket to attend various conferences and book fairs from which the agency benefited. As of 2016 when Crowe finally left the agency, she was spending approximately $12,000 per year out of her own pocket supporting her stable of authors. In addition, Crowe never sought reimbursement for the bulk of her out-of-pocket expenses during the period following the 2014 agreement.

The evidence also demonstrated that Klinger was aware that Crowe was paying her own expenses, it was never a concern for him and he never offered to reimburse her for them.

Crowe's considerable investment in the agency supports her claim that Klinger agreed that she would keep her share of her commissions in the event she departed the agency. Crowe testified that her desire to protect her investment and the financial security of her family were among the reasons she sought post-termination commissions. The fact that she stayed with and continued to invest in the agency for another two and a half years after the agreement was reached is further evidence that Crowe's understanding of the agreement is accurate.

Finally, the evidence supports the conclusion that, until Klinger accused Crowe of being a faithless servant, he fully intended to pay Crowe her post-termination commissions. He reversed course and decided to hold "under protest" the post-employment commission check he was planning to pay her relying on nothing more than an assumption that she had solicited her authors before she left the agency. He then used that assumption to advance his faithless servant fiction even though he had made no effort to keep Crowe's authors and was incapable of doing so.

20

The oral commission agreement for payment of commissions on deals finalized prior to Crowe's resignation was also not barred by the Statute of Frauds. *Gold v. Benefit Plan Adm'rs,* 233 A.D.2d 421, 421, 649 N.Y.S.2d 482 (1996) (oral contract regarding commissions for sales finalized prior to termination, as opposed to oral contract for renewals, does not violate statute of frauds).  This is the case even though the amount of the commissions due could not be determined until some future time, "[s]uch future satisfaction of a pre-existing liability involves the matter of computation only and is merely mechanical in its application" *Gold*, 433 A.D.2.2d at 421 (quoting *Rifkind v. Web IV Music,* 67 Misc.2d 26, 34, 323 N.Y.S.2d 326 (Sup. Ct. 1971) (citing *Raes v. So–Lite Furniture Corp.,* 4 A.D.2d 851, 851, 166 N.Y.S.2d 471 (N.Y.App. Div. 1957)).

Consequently, the statute of frauds is not a bar to Crowe's claim under New York law. *See White v. Purchasing Support,* 249 A.D.2d 991, 991, 671 N.Y.S.2d 384 (1998).

**4.      Under Article 6 Crowe Earned Her Commissions.**

Even assuming the absence of an agreement, Crowe is still entitled to her commissions on all deals closed while she was still living and working in New York.

It is well-settled under New York Law that in the absence of a governing written instrument, New York courts resolve the question when a commission is "earned" and becomes a "wage" for purposes of NYLL Article 6 by reference to the parties' express or implied agreement; or, *if no agreement exists, by the default common-law rule that ties the earning of a commission to the employee's production of a ready, willing and able purchaser of the services.*  (Emphasis supplied).  *Pachtel v. Bernard Hodes Group, Inc.*, 10 N.Y.3d 609,

618 (2008) (applying default common law standard to employee agreements for the sale of goods and services).[1]

There is no dispute that Crowe earned the commissions on the contracts that were executed prior to her resignation or that, prior to her resignation, she had been receiving commissions on those contracts.  The dispute arises from Klinger's assertion that the agency is entitled to all of the commissions paid following Crowe's resignation on contracts that, although not executed, were reached as a result of Crowe's production of a ready, willing and able purchaser of the services while she was still employed with Klinger.  With respect to the same contracts, however, and with respect to contracts that were signed before her resignation, Klinger also contends that Crowe is not entitled to her share of the commissions for two reasons.  First, he contends that Crowe is not entitled to post-termination commissions because he never agreed to pay them and, second, that she is not entitled to her share of the commissions because she forfeited her commissions when she became a faithless servant under New York's faithless servant doctrine.

5.      **Pursuant To Article 6, Klinger Is Not Entitled To Crowe's Share Of Commissions On Deals Closed And Contracts Signed While She Was At Klinger In New York**.

While the question whether Crowe earned her commissions is resolved by resort to Article 6, that is not the case with respect to Klinger's claim that the agency is entitled to commissions on deals for which contracts with the publishers had not been signed prior to Crowe's departure.

---

[1] There are a number of cases under New York law based upon breach of contract, as opposed to Article 6, claims.  The decisions applying the standard applicable to breach of contract claims are not applicable here.

Klinger's faithless servant claim will be addressed separately.  However, the default standard announced in *Pachtel v. Bernard Hodes Group* applies to the relationship between employee and employer, not between the employer and third parties such as Crowe's authors or the publishers.  Crowe has not brought a claim for breach of contract under either New York or Massachusetts common law.  Under New York law, breach of contract claims, whether brought by an employee or a third party, are evaluated under a different standard that does not apply here.  Under Article 6, the parties can devise their own commission payment arrangement, even if that arrangement would otherwise conflict with the labor laws.   It is only where no agreement exists that the question whether and when an employee earns her commissions is answered by the employee's production of a ready, willing and able purchaser of the services.

There was no express or implied agreement *precluding* the payment of post-termination commissions here.  Nor was there a written agreement from which one could conclude that post-termination commissions were precluded.  Klinger claims that the subject wasn't even discussed and Crowe claims that Klinger explicitly agreed to the payments.  If one were to accept Klinger's version of events, then there was no agreement for the payment of post-termination commissions.  In that case the default rule would apply and since Crowe produced a ready, willing and able purchaser while she was still employed at the agency and living in New York, then she is entitled to her share of the commissions earned as a result without regard to when the commission was actually received.  The fact that a commission could not be practically paid until the fee was received by the agency has no bearing on whether Crowe *earned* the commission in the first instance.  *See Gold,* 233 A.D.2d at 421, 649 N.Y.S.2d 482 (1996); *Kieper v. Fusco Grp. Partners Inc.,* 152 A.D.3d 1030, 1031–33, 59 N.Y.S.3d 561,

23

562–64 (N.Y. App. Div. 2017).  New York courts have long recognized a policy against the forfeiture of earned wages, and this applies to earned, uncollected commissions as well. *Weiner v. Diebold Group, Inc.,* 173 A.D.2d 166, 166–167, 568 N.Y.S.2d 959 (1991). Consequently, "Once the commission is earned, it cannot be forfeited." *Devany v. Brockway Dev., LLC,* 72 A.D.3d 1008, 1009, 900 N.Y.S.2d 329 (2010) (quoting *Arbeeny v. Kennedy Exec. Search, Inc.,* 71 A.D.3d 177, 182, 893 N.Y.S.2d 39 (2010)); s*ee Davidson v. Regan Fund Mgt. Ltd.,* 13 A.D.3d 117, 786 N.Y.S.2d 47 (2004).

Klinger also failed to present evidence that Crowe's authors were required to sign contracts with publishers naming Klinger as their agent.  According to Crowe, the contracts, to the extent they existed, were located at the Klinger offices in New York.  Exhibit 23  revealed that Crowe did not have contracts with many of her authors and although Klinger produced a template of a contract the agency sometimes asked their authors to sign, he did not know whether any of the authors whose deals are at issue here had any contract with the agency. Simply put, neither Klinger nor Crowe could either produce the contracts, if they indeed existed, or identify which authors may have had contracts with either Crowe or Klinger.  Even if one were to assume, however, that Crowe's authors signed the templates, it is clear from the terms of the template that Klinger was either unwilling or unable to perform the services required to entitle the agency to a commission under those terms.  Klinger acknowledged that he made no effort to contact any of Crowe's authors following her resignation.  Although he testified that he was unable to do so because Crowe was in possession of their contact information, the evidence clearly demonstrated otherwise.  Klinger routinely sent Crowe's authors their statements by email, through David Dunton (Exh. 3) and mailed their royalties checks to them from either the New York office or his home in Florida.  There was also

unrebutted evidence that Klinger's assistant kept a running list of the authors with their mailing addresses. *See* Exhs. 14, 16. Further, there was no evidence that Klinger asked Crowe for the telephone numbers for her authors and certainly no evidence that, had he done so, she would not have provided them. There was also no evidence that Klinger attempted to ascertain whether any of Crowe's authors had contracts with either Crowe or the agency, whether he looked for any of the contracts in his office, or whether he ever attempted to contact the authors for a copy of any such contracts. That is all understandable as Klinger acknowledged that he was not in a position, following Crowe's departure, to continue to provide services to her authors. As a result, Klinger has no claim to any of the deals closed on behalf of Crowe's authors following her departure from the agency.

Klinger also presented no evidence that publishers either owed or paid commissions to Klinger prior to the signing of the publishing contract and there was ample evidence to the contrary. Of the 13 deals described in Exhibit 23 as deals coming this year, 8 never came to fruition. Even with respect to the contracts appearing under the heading, "Deals just made" in Exhibit 23, one of those deals identified as Tangled by Leila Howland ($40,000) was contingent upon the agreement of another publisher to allow it to happen. According to Crowe, that permission had not yet been obtained as of her resignation and Klinger presented no evidence to the contrary. The remaining 3 deals appearing under "Deals just made," were in various stages of negotiations and not ready for signature. Klinger also freely admitted that Crowe was not entitled to any commissions unless the publishing contracts were signed.

**6.    Klinger Violated New York Labor Laws When It Failed To Furnish Crowe With A Statement Containing Her Gross Wages, Deductions And Net Wages.**

NYLL § 195 contains detailed and explicit employee wage payment notice requirements. Included in section 195(3) is the requirement that the employer furnish its employees, "with a

statement with every payment of wages" that includes, inter alia, gross wages, deductions and net wages. The evidence established that Klinger routinely failed to comply with the requirements of section 195(3) when Crowe was living and working in New York. Crowe's commission payments fluctuated from pay period to pay period as did the revenues the agency received on account of Crowe's authors. The authors statements Crowe was supplied did not necessarily reflect the wages she was paid in any given pay period and did not contain any information regarding deductions from her pay. Crowe was supplied her pay statements only on a sporadic basis, at best, and the statements she did receive did not accompany the corresponding pay check. As a result, Crowe was unable to determine whether the net wages she was receiving were correct.

**7.     The Massachusetts Wage Act Applies To The Period June 2015 To Present.**

Although the commission payment agreement was initially negotiated and formed when Crowe was in New York, it was extended when, in June of 2015, Crowe moved to Massachusetts. From that point forward, this case involved work performed by Crowe when she was a Massachusetts resident, paid by deposits and checks sent to Massachusetts for work she primarily performed in Massachusetts. The Agreement was modified in October 2015 to provide for the bi-weekly payment of commissions received by the agency in the immediately preceding two week period.

When Crowe changed her residence from New York to Massachusetts and began working from Massachusetts, she became entitled to the benefits of "fundamental" Massachusetts public policy intended to ensure enforcement of the Massachusetts Wage Act for citizens working here. (Wage Act embodies "fundamental public policy"). *See Melia v. Zenhire, Inc.,* 462 Mass. 164, 169, 176, 967 N.E.2d 580, 591–92 (2012); *see also Somers v.*

*Converged Access, Inc.*, 454 Mass. 582, 592-93 (2009).  In *Melia*, the SJC considered whether

to enforce a forum selection clause where doing so would compel a former vice-president to

litigate claims of Massachusetts Wage Act violations in New York, where the plaintiff had

performed some of his work and where the employer was located. The SJC ruled that, in

principle, a forum selection clause that would deprive a Massachusetts employee of his right to

prosecute Wage Act claims is not enforceable where the chosen forum may apply a foreign law

that "is less protective of employees," for this would deprive the employee of "substantive

rights guaranteed by the Wage Act" in violation of public policy. *Melia*, 967 N.E.2d at 173

(citation omitted). The Supreme Judicial Court of Massachusetts has emphasized the

importance of the Weekly Wage Act to the public policy of the state.  *Id.* at 588 (stating that

the Act "protect[s] fundamental public policy," and that "the Legislature has highlighted the

fundamental importance of the Wage Act"). Accordingly, the court has held that the

protections of the Weekly Wage Act cannot be waived by workers. *Id.*; *see* Mass. Gen. Laws

ch. 149, § 148 ("No person shall by a special contract with an employee or by any other

means exempt himself from this section....").[5]  The Act does not "guarantee venue in a

Massachusetts court," however, a forum selection clause that, in operation, would apply law

that "would effectively deprive the employee of substantive rights guaranteed by the Wage

Act." *Melia*, 967 N.E.2d at 589 violates public policy and is unenforceable." *Id.* at 590.  *Rueli*

*v. Baystate Health, Inc.,* 835 F.3d 53, 60–61 (1st Cir. 2016) (citing *Melia*). The purpose of the

Wage Act is "to prevent the unreasonable detention of wages." *Boston Police Patrolmen's*

*Ass'n v. Boston,* 435 Mass. 718, 720, 761 N.E.2d 479 (2002) (citing, *American Mut. Liab.*

*Ins. Co. v. Commissioner of Labor & Indus.,* 340 Mass. 144, 147, 163 N.E.2d 19 (1959)).

The Act allows private plaintiffs to sue for treble damages, attorneys' fees, and costs and

provides that, "any employee leaving his employment shall be paid in full on the following regular payday." The Act also requires that "[e]very person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him" within a fixed time period after the work is performed. M.G.L. 149, § 148. In this case that fixed time period is, "within six days of the termination of the pay period during which the wages were earned. . ." *Id.*

Since Crowe was both living and working in Massachusetts when she terminated her employment with Klinger, Massachusetts law applies to the questions whether she earned her commissions prior to her resignation, when those commissions were due her, and what, if any damages are due her as a result of any violations of Massachusetts Wage Laws.

**8.      Crowe Earned Her Commissions Under The Massachusetts Wage Act.**

To prevail on a claim under Mass. Gen. Laws ch. 149, § 148, a plaintiff must prove that (1) she was an employee under the statute, (2) her form of compensation constitutes a wage under the statute, and (3) the defendants violated the Act by not paying her wages in a timely manner. *Stanton v. Lighthouse Fin. Servs., Inc.,* 621 F.Supp.2d 5, 10 (D. Mass. 2009). It provides a cause of action for loss of wages and other benefits and applies, "so far as apt, to the payment of commissions when the amount of such commissions less allowable or authorized deductions, has been *definitely determined* and has become *due and payable* to such employee. *See* M.G.L. 149 §§ 148, 150 (emphasis added); *Okerman v. VA Software Corp.,* 69 Mass.App.Ct. 771, 775 n.6, 871 N.E.2d 1117, 1121 n.6 (2007)." An employee who prevails in a private action under the Act shall be awarded treble damages, costs, and attorney's fees. *Melia,* 462 Mass. at 169–70; *Okerman,* 69 Mass.App.Ct. at 775 n.6. The Act

imposes strict liability on employers, who must suffer the consequences of violating the statute regardless of intent. *Dixon v. Malden,* 464 Mass. 446, 452 (2013).

Commissions are due and payable when "any contingencies relating to their entitlement have occurred." *Sterling Research, Inc. v. Pietrobono,* No. 02–40150, 2005 WL 3116758, at *11 (D. Mass. Nov. 21, 2005); *Lohnes v. Darwin Partners, Inc.,* 2002 WL 31187688, at *3 (Mass.Super.Ct. July 23, 2002); *Gallant v. Boston Exec. Search Associates, Inc.*, No. CIV.A. 13-12081-FDS, 2015 WL 3654339, at *6 (D. Mass. June 12, 2015).

Commissions qualify as wages under the statute "when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee." *Gallant*, 2015 WL 3654339, at *6.; *see Weems v. Citigroup, Inc.,* 453 Mass. 147, 151, 900 N.E.2d 89 (2009). "In order to be 'definitely determined,' a commission must be 'arithmetically determinable.' " *McAleer v. Prudential Ins. Co. of America,* 928 F.Supp.2d 280, 287 (D.Mass.2013) (citing *Wiedmann v. Bradford Group, Inc.,* 444 Mass. 698, 708, 831 N.E.2d 304 (2005).

In determining when a commission is due and payable under Massachusetts law, courts apply the terms of a compensation plan that specifically sets out the contingencies an employee must meet to earn a commission. *See, e.g., Watch Hill Partners v. Barthel,* 338 F.Supp.2d 306, 307–08 (D.R.I.2004). However, where, as here, the plan does not specify, the Massachusetts employee earns the commission and it becomes due and payable when the employee closes the sale, even if there is a delay in actual payment. *See Sheedy v. Lehman Bros. Holdings Inc.,* No. 11–11456, 2011 WL 5519909, at *4 (D. Mass. Nov. 14, 2011); *DeSantis v. Commonwealth Energy Sys.,* 68 Mass.App.Ct. 759, 864 N.E.2d 1211, 1219n12 (2007). As a result, Crowe earned her commissions on all deals she closed prior to her

departure from the agency even if Klinger did not receive the commission payments until after she resigned her employment.

The Massachusetts statute of frauds, M.G.L. ch. 106, § 2-201, does not bar enforcement of the oral agreement reached here. This is not a contract for the sale of goods or between merchants. The contract is valid and enforceable under Massachusetts law.

**9.      The Klingers Violated Both Massachusetts And New York Law When They Failed To Pay Crowe Commissions Earned Following Her Departure From The Agency.**

Both Massachusetts and New York law require that payments to separated employees be made, at the latest, on the first payday following separation. Nonetheless, the wages due Crowe no later than September 30 and the wages due no later than October 14 were not paid until October 19, 2016.[2]   The list that accompanied the checks does not indicate when the agency received the payments reflected on the list nor do they meet the requirements of pay statements under either Massachusetts or New York wage laws.

Finally, while section 198 does not in itself provide substantive rights for an employee, it does provide remedies for substantive violations of other provisions set forth in Article 6 of the NYLL. In pertinent part, section 198 provides:

> 1–a. In any action instituted upon a wage claim by an employee or the commissioner in which the employee prevails, the court shall allow such employee reasonable attorney's fees and, upon a finding that the employer's failure to pay the wage required by this article was willful, an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found due.

---

[2] The first check dated October 4, 2016, but not paid until October 19, 2016, purports to be for the period 9/12/2016 - 9/30/2016. The second check, dated October 17, 2016, purports to be for the period 10/1/2016 - 10/15/2016.

10.    **The Klingers Retaliated Against Crowe Following Her Resignation From The Agency In Violation Of Both New York And Massachusetts Law.**

Retaliation is prohibited under both Massachusetts and New York law.  Massachusetts General Laws Chapter 149, Section 148A prohibits employers from penalizing employees, "in any way as a result of any action on the part of an employee to seek his or her rights under the wages and hours provisions of this chapter."  Crowe claims that Klinger retaliated against her when he threatened to sue her, her new employer, her publishers and her authors, withheld her commission checks and accused her of being a faithless servant, all in an effort to force her to forgo the commissions rightfully due her.  The checks were not issued until well after Klinger learned of the complaint filed against him and the risk of treble damages, fees and costs. Pursuant to M.G.L. chapter 149, section 150, payment of wages owed after the filing of a wage complaint, is not a defense to a claim brought under the Massachusetts Wage Act. *See* Complaint; Exh. H).

11.    **The Faithless Servant Doctrine Does Not Apply To The Facts Of This Case.**

The Klinger's claim that Crowe was a faithless servant, thus relieving them of the obligation to pay commissions.

The faithless servant doctrine provides that an employee who is faithless in performance of his or her duties is not entitled to recover either salary or commission for the period encompassing the disloyalty. *Maritime Fish Prods., Inc. v. World–Wide Fish Prods., Inc.,* 100 A.D.2d 81, 88 (1st Dep't 1984).  While the phrasing of the rule may imply a broad proposition, courts apply the rule relatively narrowly and, as a result, consistently only hold an employee liable under the faithless servant doctrine if the employee has usurped a corporate opportunity or actively stolen from the employer.  *See, e.g., W. Elec. Co. v. Brenner,* 41 N.Y.2d 291, 295 (1977) (employee theft); *Maritime Fish Prods.,* 100 A.D.2d at 88 (employee

usurping corporate opportunity); *Visual Arts Found., Inc. v. Egnasko,* 91 A.D.3d. 578, 579

(1st Dep't 2012); *Soam Corp. v. Trane Co.,* 202 A.D.2d 162, 162 (1st Dep't 1994) (employee

promoted competitor's products over employer's); *Phansalkar v. Andersen Weinroth & Co.,*

*L.P.,* 344 F.3d 184, 203 (2d Cir. 2003) (employee usurped corporate opportunity); *Matter of*

*Marceca,* 40 A.D.3d 318, 318 (1st Dep't 2007) (employee theft); *212 Inv. Corp. v. Kaplan,*

2007 WL 2363233, at \*10 (Sup.Ct. N.Y. Cnty. July 18, 2007) (partner stole partnership

assets).  Those that fall short of theft, alleging for example, a failure to zealously pursue sales,

or secretly establishing a competitive business, fail to pass muster under the faithless servant

doctrine.  Departures motivated by personal interests are also not actionable.  *See*

*Headquarters Buick-Nissan v Michael Oldsmobile*, 149 A.D.2d 302, 304 (1st Dept. 1989).  As

the New York Supreme Court recently re-iterated in *Pozner v. Fox Broad. Co.*, 59 Misc. 3d

897, 900–01, 74 N.Y.S.3d 711, 713–14 (N.Y. Sup. Ct. 2018), an employee's duty of loyalty

has only been extended to cases where the employee "act[s] directly against the employer's

interests—as in embezzlement, improperly competing with the current employer, or usurping

business opportunities." *Veritas Capital Mgt., L.L.C. v. Campbell*, 82 A.D.3d 529, 530, 918

N.Y.S.2d 448 (1st Dept. 2011); *Linder v. Innovative Commercial Sys. LLC*, 41 Misc.3d 1214,

at \*6, 2013 N.Y. Slip Op. 51695, 2013 WL 5663173, at \*1 (Sup. Ct. N.Y. County 2013), *affd*

127 A.D.3d 670, 8 N.Y.S.3d 191 (1st Dept. 2015); *Sullivan & Cromwell LLP v. Charney*, 15

Misc.3d 1128, at \*6, 2007 N.Y. Slip Op. 50889, 2007 WL 1240437, at \*5 (Sup. Ct. N.Y.

County 2007); *see also Feiger v. Iral Jewelry,* 41 N.Y.2d 928, 928 (1977).  In *Feiger*, a

jewelry salesman paid by commission only under an oral agreement with his employer,

established a competing business with one of his employer's two shareholders, making his

preparations to do so while he was still employed.  They discussed their plans, met with an

attorney, prepared corporate documents, opened and funded a corporate bank account, prepared stationary, acquired jewelry molds and told some of their customers about their plans. *Feiger,* 41 N.Y.2d at 997. Here, as in *Feiger,* the employer relied upon a theory that evolved over time and then sought recapture of commissions already paid in an amount that far exceeded the alleged period of dishonesty. The Court in *Feiger,* emphasizing the need for some kind of "commercial banditry" to warrant forfeiture of commissions earned, against the employer and in favor of the salesman. Likewise in *Linder v. Innovative Commercial Sys. LLC,* 41 Misc. 3d 1214(A), 981 N.Y.S.2d 636 (N.Y. Sup. 2013), aff'd, 127 A.D.3d 670, 8 N.Y.S.3d 191 (N.Y. App. Div. 2015), the court granted summary judgment against a former employer on faithless servant counterclaims holding that an employee compensated solely on commission does not breach either a duty of good faith or of loyalty by failing to zealously pursue sales. Here, as in *Linder,* there was neither a theft of property nor active divergence of corporate opportunities, nor was Crowe's failure to push sales through before she left the agency or her failure to stay at the agency long enough to complete sales behavior of the nature as would support a faithless servant claim.

The facts of *Luskin v. Seoane,* 226 A.D.2d 1144 (1996), shed light on the limited circumstances under which New York courts apply the faithless servant rule. In that case, the employee was convicted of grand larceny from her employer. Even then, the court limited forfeiture to, "all compensation and expenses that the [employer] paid to [employee] during the periods of her criminal activity, disloyalty and breach of fiduciary duty."

Similarly, in *Maritime Fish Prods., Inc. v. World-Wide Fish Prods., Inc.* 100 A.D.2d 81 (1984), the employer brought disloyal employee and unfair competition claims against a former vice-president who secretly incorporated a competing business 14 months prior to his

33

departure, corrupted a former employee, and secretly pursued and profited from one or more opportunities properly belonging to his former employer.  The employee in that case willfully disregarded a subpoena and failed to even appear to defend the employee disloyalty case.  In that case, the court, while noting that, "Clearly an agent may secretly incorporate a competitive business prior to his departure as long as he does not use his principal's time, facilities or proprietary secrets to build the competing business..", also held that, while still employed, "...he was in business for himself, while drawing a salary from a trusting employer." *Id.* at 88.  Even on those facts, the court remanded the case for consideration of the damages related to the period of time during the 14 months during which he operated a competing business while still employed by his former employer.

In *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140 (2d Cir. 1999), the rule was applied where an employee engaged in fraudulent, dishonest and criminal conduct for his personal enjoyment and financial benefit for which he was sentenced to seven years in prison.  *See also In re. Blumenthal,* 32 A.D.3d 767 (2006) (former executor made systematic, unauthorized transfers to himself and various family members); *Visual Arts Foundation, Inc.*, 91 A.D. 3d 578  (former employee engaged in fraud and conversion for which he was incarcerated); *Trimarco v. Data Treasury Corp.*, 2010 WL 2754052 (N.Y. Sup), 2010 N.Y. Slip op 31691 (COO developed the business of a company in which he and his family members held equity interests, and a company he formed for the purpose of competing with his employer).

Klinger complains that, commencing on or about August 24, 2016, while Crowe was on vacation, she kept him in the dark about deals she was working on and delayed completing deals where offers had been made so that she could move those

deals to Pippin.  To support that claim, Klinger relied upon an email authored the day after the plaintiff's resignation in which she wrote about a deal that she had not negotiated yet, a work for hire contract that was "coming soon", a contract that the author wanted to "hold off signing as she wants it to be at Pippin," and a fourth contract that the Plaintiff wrote, "is coming at any minute."  However, even assuming the email is an accurate assessment of the status of various deals, Crowe's failure to close the deals while at the agency does not relieve Klinger of the obligations to pay her on the deals she did close, nor does it entitle them to commissions on the deals she did not close.

Klinger has apparently abandoned his claim that Crowe solicited business from the authors who chose to move with her to Pippin and he failed to prove that Crowe would or could have closed the deals at issue prior to her departure.  To the contrary, Crowe was not able to close any of the deals at issue for weeks, if not months, after she began working at Pippin and she was under no obligation to keep Klinger informed of her communications with Pippin prior to her resignation.

Finally, the mere fact that the authors moved with Crowe to Pippin, while predictable, is not actionable under the faithless servant rule.  Crowe was the only agent at Klinger whose work focused on authors of children's books.  Indeed, so obvious was the choice for Crowe's authors upon her departure, that Klinger made no effort whatsoever to secure their continuing business following her resignation.  Thus, to the extent Klinger's faithless servant claim relies upon the question whether or when the contracts were offered, received, negotiated or signed, it fails as both Crowe and the authors had the absolute right to move their business from

Klinger to Pippin and Klinger failed to prove that Crowe's dealings with her authors either before or after her resignation were in any way inappropriate.[3]

Klinger also conflates the question of commissions due with the faithless servant claim. The question whether Klinger is due commissions on contracts made with authors formerly represented by Klinger has nothing to do with the application of the faithless servant rule.  In the absence of a non-compete, the rule does not prevent a literary agent from interviewing or taking a position with a competitor.[4]  In fact, had she chosen to do so, Crowe was free to build a competitive business of her own while still employed at Klinger.  *Maritime Fish Products*, 100 A.D.2d 81.

The faithless servant rule also does not prevent an author from moving its existing or future deals to another agency and although commissions due on contracts executed during the course of the agents' employment entitle the agency to commissions earned on those contracts, there is no claim here that Klinger hasn't received those commissions.  To the contrary, Klinger has been receiving its share of the commissions on revenues generated by the Klinger contracts since Crowe's departure.

Moreover, even if Crowe had violated her duty of loyalty to an employer, she is still entitled to compensation for the period in which there was no violation. *Design Strategy, Inc. v. Davis,* 469 F.3d 284 (2d Cir. 2006) (applying New York law); *National Bank of Pakistan v. Basham*, 148 A.D.2d 399, 539 N.Y.S.2d 347 (1st Dep't 1989); *Astra USA v. Bildman*, 455 Mass. 116, 135-136, 914 N.E. 2d 36 (2009).  Klinger testified that Crowe's faithlessness

---

[3] Klinger offered no evidence that he is not receiving the commissions due on contracts signed with the Klinger agency or that any of the deals not closed could, or would, have been closed while Crowe still was at Klinger.

[4] There is no non-compete in this case and none was alleged.

commenced while she was on vacation approximately two weeks before she resigned.  His claim that he is somehow entitled to recover all of the commissions he paid Crowe from that point forward, even those commissions she earned long before her period of faithlessness commenced, is not supported by the cases that have interpreted the rule.  Klinger was only able to identify a handful of deals, none of which could have been closed while Crowe was still at Klinger or by another agent at Klinger following her departure, to which he claimed he was denied his commissions.  There is simply no view of the facts that would support Klinger's claim to disgorgement of all commissions paid to Crowe.

**12.    Crowe Is Entitled To Damages Under Both New York And Massachusetts Law.**

(a)    <u>Damages Under New York Law For The Period Up To Crowe's Move To Massachusetts.</u>

Under New York labor laws, employers that fail to provide a wage statement to employees pursuant to section 195 (3) are subject to damages of $250 for each work day in which the violations occurred not to exceed $5,000.00 together with attorney's fees and costs.[5] The agency has failed to raise the available affirmative defenses to this claim.  Crowe established that she rarely received wage statements accompanying her paychecks, if she received them at all.  As a result, Crowe is entitled to the maximum of $5,000.00 and attorney's fees and costs in connection with this claim.

Violation of the anti-retaliation protections under New York law can result in liquidated damages of up to $10,000 per aggrieved employee.  Given the nature of Klinger's conduct following Crowe's resignation, the maximum damages are warranted here.

---

[5] The statute of limitations on the Section 195(3) claim is six (6) years. N.Y.L.L. section 198.

(b)   <u>Damages Under Massachusetts Law For The Period During Which Crowe Was A Massachusetts Employee</u>.

Pursuant to M.G.L. ch. 149, §148, Crowe's post–employment payment of wages were due on the following regular paydays.  The section applies to commissions when the amount of the commissions has been earned and definitely determinable.

The regular paydays following Crowe's separation from the agency, were September 16, September 30 and October 14, 2016.  On September 30, 2016, after Crowe made a demand for post-termination commissions, Klinger advised Crowe, through counsel, that they, "will hold the check he was going to pay her under protest now,"  accused Crowe of being a "faithless servant," offered to allow her to retain rights that she already had and to which Klinger had no claim, and threatened to sue her for the, "repayment of commissions paid to Ms. Crowe since she agreed to move to the new firm" in the event she did not agree to forgo all commissions. On October 5, 2016, Crowe filed a wage complaint with the Massachusetts Attorney General. After obtaining leave to file suit, Crowe filed the within action.

On October 19, 2016, following the filing of both the wage complaint with the Massachusetts Attorney General and the complaint in this action, of which the Klingler's had actual notice through counsel, Klinger issued two checks to Crowe, totaling $20,087.79 for commissions earned from Crowe's authors.  Those payments were made after the filing of Crowe's wage complaint.  As a result and as a matter of law the payments are not a defense to Crowe's section 148 claim.  M.G.L. ch. 149, § 150.

Although some courts have ruled otherwise, the treble damages provision of Section 150 is mandatory.  The section provides, in pertinent part, "An employee . . .who prevails . . shall be awarded treble damages, as liquidated damages. . ." *Id*.  Application of the ordinary

38

rules of statutory construction leaves this court without the discretion to award less than treble damages.

Nonetheless, treble damages are well supported both by Klinger's failure to timely pay Crowe's commissions following her resignation and by the circumstances surrounding the effort to deprive her of those commissions when due.  Klinger implicitly acknowledged that he was aware of his obligation to pay Crowe when his counsel wrote that he would hold the check he was going to pay her under protest where the only check he could have been referring to was a check for post-employment commissions.  That act, when coupled with the threat to sue Crowe if she did not agree to forgo her commissions, all premised on the erroneous and unsupported assumption that she had improperly solicited authors that Klinger readily acknowledged he could not keep, supports an award of treble damages.  The delay cannot be justified upon a claim that the parties were engaged in settlement negotiations.  Klinger persisted in his failure to pay even after he learned that Crowe had filed her Declaratory Action complaint and was seeking treble damages.  Klinger's conduct was more than just heavy handed.  It amounted to a threat to punish Crowe for asserting her rights and therefore, constitutes retaliation under Massachusetts law.

The wages paid late amounted to $20,087.79.  When trebled, the sum due Crowe under Massachusetts Law amounts to $60,263.37.

(c) <u>Reasonable Attorney's Fees And Costs.</u>

Under both New York and Massachusetts law, plaintiffs who prevail in wage and hour actions are entitled to recover reasonable attorney's fees and costs.  The method used to determine the reasonable attorney's fees is the number of hours expended on the litigation multiplied by a reasonable hourly rate, which is based on rates prevailing in the community for

similar services of lawyers with comparable skill, experience and reputation. The party seeking the award must support its request by providing time records reflecting the date, hours expended, and nature of the work, for each attorney.

    (d)  <u>Other Additional Damages.</u>

New York law provides for an award of prejudgment interest in certain circumstances, including wage and hour cases under the Labor Law and the Fair Labor Standards Act. As of 2011, the statutory rate of interest was 9 % per annum. Massachusetts pre-judgment interest applies to the Massachusetts state law claims. The statutory rate under Massachusetts law is 12% per annum.

    Damages due Crowe are summarized below:

(a) <u>Total Damages Under New York Law</u>:  $15,000.00

(b) <u>Total Late Paid Commissions Trebled Under Massachusetts Law</u>:  $60,263.37

(c) <u>Attorney's Fees and Costs</u>:  Pending ruling on fee petition.

(d) <u>Prejudgment Interest</u>:  To be calculated as of date of judgment.

<div style="margin-left:40%">

Respectfully submitted for the
Plaintiff, Sara Crowe


*/s/ Juliane Balliro*
Juliane Balliro (BBO# 028010)
Nelson Mullins Riley & Scarborough LLP
One Post Office Sq.
Boston, MA 02109
617-217-4700
juliane.balliro@nelsonmullins.com

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of August, 2018 I served the within document electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/Juliane Balliro*