UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SARA CROWE,                           )
                                      )
                    Plaintiff,        )
          v.                          )          CIVIL ACTION
                                      )          NO.  16-12033-JGD
HARVEY KLINGER, INC.                  )
and HARVEY KLINGER,                   )
                                      )
                    Defendants.       )

## FINDINGS OF FACT AND RULINGS OF LAW

December 27, 2018

DEIN, U.S.M.J.

### I.  INTRODUCTION

This action arises out of an employment dispute between the plaintiff, Sara Crowe, and

her former employer, Harvey Klinger, Inc. ("the Agency"), and its principal and CEO, Harvey

Klinger (collectively, the "defendants").  Ms. Crowe claims that her oral employment contract

required the Agency to pay her commissions on deals related to authors she brought to the

Agency, including future commissions generated by the authors, regardless whether Ms. Crowe

remained employed by the Agency.  Ms. Crowe further claims that in violation of her oral

employment contract, the defendants temporarily stopped paying her commissions after she

left the Agency.  Ms. Crowe did not give Mr. Klinger advance notice of her intention to leave,

and Mr. Klinger was upset by her departure.  This hotly-contested litigation followed promptly

after Ms. Crowe's resignation.

By her Amended Complaint (Docket No. 4), Ms. Crowe has brought claims against the defendants for violation of N.Y. Lab. Law § 198 (The New York Wage Theft Prevention Act ("WTPA")) (Count I), violation of N.Y. Lab. Law § 195(1) (Count II), violation of the anti-retaliation provisions of the WTPA (Count III), violation of Mass. Gen. Laws ch. 149, § 148 (the Massachusetts Wage Act) (Count IV), treble damages under Mass. Gen. Laws ch. 149, § 150 (Count V), and relief pursuant to 28 U.S.C. § 2201 (the Declaratory Judgment Act) (Count VI).  In response, the defendants denied any liability, and asserted affirmative defenses that Ms. Crowe is a "faithless servant" and, therefore, not entitled to any commissions, that any oral agreement for the payment of commissions is barred by the New York State Statute of Frauds, and that the commissions paid were just part of her salary and, presumably, ended with her employment.[1] (Docket No. 43 ¶¶ 6-8).  The defendants also have asserted counterclaims seeking to recover amounts paid to Ms. Crowe.  (See id. ¶¶ 20-26).

A jury-waived trial was held before this court on June 11 and 12, 2018.  Ms. Crowe and Mr. Klinger testified and 76 exhibits were introduced. The parties submitted proposed findings and rulings on August 2, 2018 and their replies on August 16, 2018.  (See Docket Nos. 72-75).  This court has reviewed the transcripts, exhibits, and parties' submissions.  Based on the evidence presented, this court makes the following findings of fact and rulings of law.

---

[1] As detailed below, the defendants have waived the affirmative defense of Statute of Frauds by not addressing it in any pleading, despite it being referenced by the plaintiff.  The claim of payment of salary was never raised again by either party.  It is deemed waived and will not be addressed further herein.

## II. <u>FINDINGS OF FACT</u>[2]

### <u>Background</u>

The plaintiff, Ms. Crowe, was employed as a literary agent by the Agency from February 2005 to September 8, 2016. (Tr. I:30, 116). As a literary agent at the Agency, Ms. Crowe represented children's fiction and adult fiction authors. (<u>Id.</u> at 32). She represented her authors' written works to publishers, assisted in the sale and deal negotiation of those authors' works, and was responsible for initiating and maintaining relationships with the authors. (<u>Id.</u> at 31-32).

The defendant, Mr. Klinger, is the president of the Agency, located in New York City and incorporated in the State of New York. (Tr. II:66). The Agency has been in business for nearly forty years representing authors. (<u>Id.</u> at 67-68). The Agency earns commissions from amounts paid to an author on works that are accepted by a publisher. (<u>See</u> Tr. I:45-46). A literary agent working on a deal is generally paid a commission based on an agreed percentage earned by the Agency from that agent's authors. (<u>Id.</u>).

When a literary agent represents an author, the agent works with the author to edit and finalize the novel or manuscript. (<u>Id.</u> at 32). The agent then submits the novel or manuscript to publishers that the agent thinks may want to buy it. (<u>Id.</u>). Publishers provide initial offers for the rights to publish the author's work and the literary agent then negotiates the terms of the contract with the publisher on behalf of the author over a period of time until the contract is ready to be signed. (<u>See</u> Tr. II:76). The author has the final say on accepting or rejecting the

---

[2] The trial transcript will be cited as "Tr." followed by the day (I or II) and page. Trial exhibits will be cited as "Tr. Ex. ___."

contract.  (Id. at 77).  Once a contract is signed, the literary agent continues to manage the day-to-day needs of the author.  (Tr. I:153; II:74).

The advance and royalties on a book deal are transferred from the publisher to the Agency, and the Agency takes a fifteen percent commission before transferring the remaining balance to the author.  (Tr. I:46).  A portion of the fifteen percent commission taken by the Agency is provided to the literary agent, depending on his or her salary arrangement, and the remainder is retained by the Agency.  (Id.).  Recognizing that there was some conflicting testimony as to when an Agency earns a commission, this court finds that the Agency did not get paid its commission until an author signed a deal with a publisher, and that the literary agent did not receive her portion of the commissions until the Agency was paid.  (See id. at 45; Tr. II:132-33).

### Ms. Crowe's Employment with the Agency

Prior to working at the Agency, Ms. Crowe worked at several other literary agencies as a foreign rights agent, representing a number of authors in adult fiction and children's fiction. (Tr. I:28-30).  In February 2005, the Agency hired Ms. Crowe to work as a literary agent in New York City.  (Id. at 30-31).  Ms. Crowe was an at-will employee and she never signed a non-compete agreement with the Agency.  (See id. at 31).  Ms. Crowe began to specialize in children's books at the Agency and regularly attended book fairs on behalf of the Agency.  (Id. at 33, 137-38).  She testified that by the time she resigned, Ms. Crowe was generating half of the Agency's gross revenues from her authors.  (Id. at 180).

When Ms. Crowe started at the Agency, her compensation was structured to provide a base salary of $30,000, called a "draw," with a fifty-fifty split between her and the Agency of

any commissions she earned above the draw.  (Id. at 33-34).  After two or three years, Ms. Crowe testified that she requested an increase in her compensation structure to a $40,000 draw and a sixty-forty split above the draw.  (Id. at 34-35).  Mr. Klinger agreed to her request. (Id. at 157).  Again, in 2012, Ms. Crowe requested and was granted a raise to a $60,000 draw with the same sixty-forty split.  (Id. at 35, 157).  In February 2014, Ms. Crowe requested to change her compensation structure to commissions only.  (Id. at 35-36).  Ms. Crowe testified that Mr. Klinger told her that switching to commissions only "would put a lot of pressure on [her], [and] that it wasn't a good idea." (Id. at 36).  After further discussion, Mr. Klinger eventually agreed to pay Ms. Crowe exclusively on commission in a seventy-thirty split with the Agency.  (Id. at 37-38).  This change was retroactively applied to January 1, 2014 and, as with the previous salary changes, not reduced to a written agreement.  (Id. at 38-39).

The parties dispute whether during these conversations Ms. Crowe requested that the terms of her compensation be put in writing and whether the parties agreed that she would continue to receive her commissions if there were changes at the Agency engendered either by Mr. Klinger's or her own departure from the Agency.  (See, e.g., id. at 38, 42; Tr. II:118, 165). This court finds Ms. Crowe's testimony to be credible and persuasive.  Thus, this court finds that Ms. Crowe did ask for a written agreement spelling out the terms of her compensation, and that Mr. Klinger (and the Agency) agreed that she would keep her commissions, and the Agency would keep its commissions, on commission-generating contracts if she left the Agency.  (See Tr. I:38).

Ms. Crowe was concerned about the security of her family going forward, and she needed to know that "should [Mr. Klinger] retire or close the agency or should [she] leave, . . .

[she] would be keeping [her] commissions." (Id. at 37).  By this time, Mr. Klinger was spending November through April in Florida and the summer in Maine.  (Id. at 44).  He was in the office approximately three to four days a week for four months of the year.  (Id. at 44-45).  Ms. Crowe also found out that David Dunton, who handled payments and accounting at the Agency, was moving to Hawaii.  (Id. at 48-49).  This raised in Ms. Crowe's mind a concern that the terms of her payment should be in writing, as well as a concern about the future of the Agency.  (Id.).  In light of these facts, this court finds Ms. Crowe's description of events and the terms of the parties' oral agreement in February 2014 to be very credible and accepts them as true.

In June 2015, Ms. Crowe's husband was transferred to Massachusetts for work, and Mr. Klinger allowed Ms. Crowe to work remotely from Massachusetts.  (Id. at 47).  Ms. Crowe testified that after she moved to Massachusetts, she rarely traveled to the Agency's New York offices but still maintained an office at the Agency.  (Id. at 47, 150).  She continued to attend book fairs, attending numerous ones in Massachusetts.  (Id. at 47-48).

Ms. Crowe was a hard-working employee.  During her tenure at the Agency, Ms. Crowe invested her own money in helping to develop her client list and the Agency's reputation.  For example, between 2011 and 2016, Ms. Crowe spent approximately $7,000 on a personal website that was linked to the Agency, hired an attorney to review and revise her contracts, including some boilerplate language, and attended various conferences and book fairs for which she was only partially reimbursed.  (Id. at 77-78, 137-43).

At trial, Ms. Crowe did testify as to some problems at the Agency, including occasions where Mr. Klinger forgot to mail or sign checks to authors, mailed checks to the wrong address, or filled out authors' 1099 forms incorrectly.  (Tr. Exs. 9-16; Tr. I:61-64, 68-71).  However, these

do not appear to have been uncommon errors for a business to make and, while undoubtedly frustrating, they appear to have been readily fixed.  (Tr. Exs. 9-16; <u>see, e.g.</u>, Tr. Exs. 12, 54 (errors made on the part of the Agency's accountants and on the part of a publisher drafting contract language for one of the plaintiff's authors)).  Moreover, some were caused by issues with the new 1099 system that the Agency had begun using.  (Tr. I:68).

With respect to Ms. Crowe's payments, she testified, and this court finds, that she had difficulty reconciling her gross commissions and her net commissions once she switched to an exclusively commission-based salary.  (<u>Id.</u> at 51).  Her payments consisted of lump sums aggregating all of her commissions for that pay period.  (<u>Id.</u> at 52).  Ms. Crowe testified that the first time she received any form of a pay stub was when she asked for pay stubs in connection with renting an apartment in 2011 or 2012.  (<u>Id.</u> at 54).  She was unable to readily determine with which commission payments her checks corresponded.  (<u>Id.</u> at 52).

Part of the confusion was due to the manner in which payment was set up by the Agency.  Specifically, the Chase Quick Pay system used by the Agency capped payments at $5,000, so Ms. Crowe often received one paycheck in several different parts.  (<u>See id.</u> at 49-50; Tr. Ex. 2).  Moreover, while Ms. Crowe did receive copies of the statements sent to her authors, from which she could calculate the amounts due to her, those statements did not always coincide with her pay periods.  (Tr. I:51-52; Tr. Ex. 3 (example of author's statement); <u>see</u> Tr. II:10-21).  Nevertheless, until her departure from the Agency, Ms. Crowe was paid in a timely manner, and she is not claiming that she is due any commissions.[3]

---

[3]  There was some testimony that one of Ms. Crowe's paychecks was late, but at trial the plaintiff conceded that it was lost in the mail.  (Tr. I:71-72; II:19).

It appears to this court that Mr. Klinger and Ms. Crowe worked closely together, that Mr. Klinger viewed himself as the plaintiff's mentor, and that her departure was unexpected and personally hurtful to Mr. Klinger. It also appears to this court that Ms. Crowe expected his reaction, and acted without giving him advance notice in order to avoid a confrontation.

## Ms. Crowe's Resignation

Around May of 2016, in addition to her concerns about the Agency's business practices, Ms. Crowe became concerned that the Agency might close because a number of Agency employees, including herself, were no longer present in the New York office. (Tr. I:73-74). On May 11, 2016, Holly McGhee, the owner of a children's literary agency, Pippin Properties ("Pippin"), reached out to Ms. Crowe about scheduling a lunch together. (Tr. Ex. 17 at PP 000049; Tr. I:28, 72-73). They met for lunch on June 13, 2016. (Tr. Ex. 17). Ms. Crowe testified that she viewed the meeting as a friendly lunch between agents. (Tr. I:73). After the June lunch, Ms. Crowe visited Pippin's office and subsequently provided Ms. McGhee with a list of her current Agency projects. (Tr. Ex. 19; Tr. I:75).[4] On June 22, 2016, Ms. McGhee invited Ms. Crowe to meet other agents at Pippin, and a meeting was eventually scheduled for August 23, 2016. (Tr. I:78-79; Tr. Ex. 21 at PP 000053).

On August 23, 2016, while Ms. Crowe was on vacation, she met with Ms. McGhee and had lunch with two Pippin agents. (Tr. I:80). On August 24th, after the lunch, Ms. Crowe emailed Ms. McGhee and the Pippin agents that she "would love to work with [them]" and that "[she was] so grateful to be considered." (Trial Exhibit 22 at PP 000083). Ms. Crowe testified

---

[4] The Agency is still receiving its share of the commissions on these projects. (Tr. I:75-76; II:135).

that she was not positive Pippin had offered her a position when she emailed Pippin after the lunch. (Tr. I:81). However, later on August 24, 2016, Ms. Crowe received an informal offer of employment from Pippin. (See Tr. Ex. 22 at PP 000083).

On August 29, 2016, Ms. Crowe sent Ms. McGhee an email in which she purported to list all of her deals since January 2015, divided into sections entitled "Deals just made," "Clients who will make new deals this year," and "Clients to part ways with." (Tr. Ex. 23 at PP 000010). "Confidential American Girl" by Varian Johnson, "Folded Notes from High School" by Matthew Boren, "Tangled" by Leila Howland, and "Brawlers" by Neil Connelly were included in the "Deals just made" section. (Id.). However, despite this listing no agreements had been signed for these titles and the contracts were still works in progress. (See Tr. I:84 (signing of "American Girl" deal), 87 (signing of "Folded Notes from High School"), 90-91 (signing of "Tangled"), 93-94 (signing of "Brawlers")).

In another email dated August 29, 2016, Ms. Crowe further stated "I want to be able to move over the offers I know are coming in for Northrop and Schroeder and also the deals I just made -- especially the TANGLED TV show tie-in." (Tr. Ex. 23 at PP 000008). She also stated "[I] will do all I can to move some important contracts over." (Id.).

In an email to Ms. McGhee on September 6, 2016, Ms. Crowe stated that she wanted to know "how we could move over some contracts to Pippin -- especially those not yet finalized." (Tr. Ex. 26 at PP 000051). She further indicated that "in an ideal world" she "would love" to "move open contracts for books not yet published to Pippin, and have the publishers pay Harvey 4.5% of the commission, which is what he gets now, and pay Pippin the remaining amount." (Id. at PP 000052). Ms. Crowe began working with a New York attorney to advise her

on moving contracts from the Agency to Pippin.  (Id. at PP 000051; Tr. I:118-19).  On September

7, 2016, the day before Ms. Crowe's resignation from the Agency, she emailed Ms. McGhee

that "[counsel] feels good about my moving all unsigned deals -- and we are going to see what

[Mr. Klinger] says before making a move on the other contracts."  (Tr. Ex. 24 at PP 000088).

September 8, 2016 was Ms. Crowe's last day of work at the Agency.  (Tr. I:116).  She

notified Mr. Klinger that day of her resignation.  (Id.).  After informing Mr. Klinger of her

resignation, Ms. Crowe testified that over the next three days she contacted her authors to

notify them that she was resigning.  (Id. at 117).  This court accepts as fact Ms. Crowe's

testimony as to the date she first notified her authors that she was leaving the Agency and

joining Pippin.

On September 9, 2016, Ms. Crowe sent Ms. McGhee an email noting therein that she

would "like to move over" two "drafted contracts" "as would the authors."  (Tr. Ex. 27 at PP

000016).  She further clarified that the first contract, for Varian Johnson's "Spirit Animals," had

not yet been negotiated.  (Id. at PP 000017).  The second contract was for two Dori Butler

books and Ms. Crowe noted that "[t]he author is holding off signing as she wants it to be at

Pippin."  (Id.; Tr. I:112-13).  At trial, Ms. Crowe testified that she thought Ms. Butler's contract

was ready to sign, but Ms. Butler "did not."  (Tr. II:38).  The defendants incorrectly assert that

this email was dated August 29, 2016, and is evidence that Ms. Crowe was having discussions

about leaving with her authors before she resigned.  (See Docket No. 73 at 11).  Put in proper

sequence, however, this email, sent on September 9, 2016, confirms Ms. Crowe's testimony

that she did not discuss leaving with her authors until she had handed in her resignation.

Moreover, despite the reference to two "drafted contracts," this court finds that these

contracts were not finalized as of that date, and that negotiations continued.  These contracts did not belong to the Agency, as detailed below.

On September 13, 2016, Ms. Crowe sent Mr. Klinger an email listing the authors who would be following her to Pippin.  (See Tr. Ex. 69).

Mr. Klinger believes that Ms. Crowe diverted several deals to Pippin that the Agency was entitled to receive commissions on.  (Tr. II:107).  These deals include "Spirit Animals" and "American Girl" by Varian Johnson, "Folded Notes from High School" by Matthew Boren, "Tangled" by Leila Howland, and "Brawlers" by Neil Connelly, for a "ballpark estimation" of $36,000 in commissions allegedly due to the Agency.  (Id. at 107-08).  With the exception of "Spirit Animals," the other above-mentioned books were listed as "Deals just made" in the email from Ms. Crowe to Ms. McGhee on August 29, 2016.  (See Tr. Ex. 23 at PP 000010).

The contract for "American Girl" is dated October 20, 2016, which was the date put on it by the publisher.  (Tr. Ex. 44; Tr. I:86).  Ms. Crowe testified, and this court finds, that she was at Pippin while negotiations for the "American Girl" contract were taking place.  (Tr. I:83-84).  The contract was not signed until at least November 2016.  (Id. at 84-87; Tr. Ex. 44).

Regarding the contract for "Folded Notes from High School," Ms. Crowe testified, and this court finds, that as of August 29, 2016, "[w]e had agreed on the fee and on some changes that he would have to make . . . but not the other details of the contract."  (Tr. I:84).  Ms. Crowe received a draft of the "Folded Notes from High School" contract after she left the Agency and while she was employed at Pippin on October 6, 2016.  (Tr. Ex. 47 at CROWE 075323).  The final signed contract is dated January 9, 2017.  (Tr. Ex. 46 at CROWE TS000141).

The signed contract for "Tangled" is dated September 29, 2016, which is also the same date that Ms. Crowe received a copy of the agreement. (Tr. Exs. 48 at 1, 49 at 1). Ms. Crowe testified that this was not a contract she had negotiated while at the Agency, although there had been some discussion with the Disney editor. (See Tr. I:90). The author signed the contract on October 6, 2016. (Id. at 91; Tr. Ex. 48).

The contract for "Brawlers" is dated September 12, 2016. (Tr. Ex. 50; Tr. I:92). Ms. Crowe testified that she thought the agreement was signed in mid-October. (Tr. I:93-94).

Ms. Crowe received a draft contract dated August 10, 2016 for "Spirit Animals" via mail. (Tr. Ex. 66; Tr. I:123). Ms. Crowe testified that Mr. Klinger was not aware of this deal at the time. (Tr. I:122; Tr. Ex. 27 at PP 000017). She also testified, and this court finds, that she negotiated this contract while she was employed at Pippin. (Tr. I:123-24; see Tr. Ex. 67). The defendants argue that Ms. Crowe held off signing this deal to bring it to Pippin. However, the evidence is that no draft was even near ready to be signed while she was at the Agency, since this deal was not closed until "November or December" of that year. (Tr. I:124).

A publisher is currently holding commissions due on two Dori Butler books in "The Haunted Library" series pending the outcome of this action. (Id. at 112-13). The author, Dori Butler, wanted her contracts to be with Pippin after Ms. Crowe left the Agency. (Id. at 113). Neither Mr. Klinger nor Ms. Crowe are receiving commissions due on the contract. (Id. at 113-14). However, Ms. Crowe testified that "[Mr. Klinger] should be getting his commission on that contract, so we made a deal with the publisher that at the outcome of this legal action, . . . they would pay [Mr. Klinger] directly and pay Pippin/me directly." (Id.).

**Post-Resignation Payments**

After Ms. Crowe resigned from the Agency, she received her commission check on September 15, 2016 for the period September 1 through September 8, 2016. (Tr. II:49). Her next check would have been due on October 4, 2016 for the last two weeks in September. (See Tr. I:164; see Tr. Ex. 74).

On September 30, 2016, counsel for the defendants informed plaintiff's counsel that Mr. Klinger would hold her checks under protest and asserted that Ms. Crowe constituted a "faithless servant" under New York law. (Tr. Ex. 68 at 4). Mr. Klinger testified that at the time he believed Ms. Crowe and Ms. McGhee had conspired against him, although he had no proof. (Tr. II:145, 125). Defense counsel did, however, propose to settle the parties' dispute. (See Tr. Ex. 68 at 4).

Not having received the commissions she believed were due, on October 5, 2016, Ms. Crowe filed a wage claim with the Massachusetts Attorney General. (See Tr. Ex. 29). The same day, plaintiff's counsel finally responded to defense counsel's email from five days before and indicated a willingness to discuss settlement options. (Tr. Ex. 68 at 3). On October 10, 2016, Ms. Crowe filed a complaint with this court. (See Docket No. 1). Mr. Klinger filed suit against Ms. Crowe in New York. (See Tr. II:131). He testified, and this court finds, that he would not have sued Ms. Crowe in New York if she had not sued him in Massachusetts. (Id.).

On October 19, 2016, on advice of counsel, the defendants issued two checks to Ms. Crowe for commissions earned from Ms. Crowe's authors. (Id. at 124; 130-32). Both checks were signed by Mr. Klinger and contained the following statement above the endorsement line: "Paid under protest. No contractual obligation to pay royalties after resignation exists. Payor

retains the right to re-claim upon judicial resolution of this issue." (Tr. Ex. 30 at CROWE

075527). The checks were dated October 4, 2016 and October 17, 2016 and corresponded to

commissions earned on her deals in the first two pay periods post-resignation. (Tr. Ex. 30; Tr.

II:129-30).

Further facts will be included below as warranted.

### III. RULINGS OF LAW

Ms. Crowe asserts claims under both New York's Wage Theft Prevention Act, see N.Y.

Lab. Law §§ 195 and 198, and Massachusetts's Wage Act, see Mass. Gen. Laws ch. 149, §§ 148,

150. Mr. Klinger's affirmative defense and counterclaim arises under the common law of New

York.

#### A.    Choice of Law

The parties disagree whether New York law applies to all conduct at issue in the instant

case, or whether Massachusetts law applies as of the date Ms. Crowe moved to Massachu-

setts.[5] This issue is relevant to whether the Massachusetts Wage Act applies. For the reasons

detailed herein, this court rules that New York law applies to all the wage issues in this case.

Where, as here, a federal court is sitting in diversity, it applies the choice-of-law

framework of the forum state. Asymmetrx Med., Inc. v. McKeon, 932 F. Supp. 2d 232, 238 (D.

---

[5] Importantly, this presents a different question than the one at issue in the court's order on the defen-
dants' motion to dismiss for lack of personal jurisdiction. (See Docket No. 27). While personal jurisdic-
tion analysis examines whether Massachusetts had sufficient minimum contacts with the defendants,
choice of law analysis examines which state – Massachusetts or New York – had the most significant
relationship to the plaintiff and her employment relationship to the defendants. See Foster-Miller, Inc.
v. Babcock & Wilcox Canada, 46 F.3d 138, 151 (1st Cir. 1995) ("The purpose of the [personal jurisdiction]
inquiry is not to compare the forum's interest to that of some other jurisdiction, but to determine the
extent to which the forum has an interest." (emphasis in original)).

Mass. 2013).  When a "statute is silent as to its extrastate applicability, as is usually the case, a court may and should as appropriately look to all the relevant choice of law considerations as if it were choosing between common-law rules."  <u>Taylor v. E. Connection Operating, Inc.</u>, 465 Mass. 191, 198, 988 N.E.2d 408, 413 (2013) (footnote omitted) (internal quotations and citation omitted).  In Massachusetts, "[t]he overarching limiting principle, as set forth in the Restatement (Second) Conflict of Laws § 9 (1971), is that '[a] court may not apply the local law of its own [S]tate to determine a particular issue unless such application of this law would be reasonable in the light of the relationship of the [S]tate and of other [S]tates to the person, thing or occurrence involved.'"  <u>Dow v. Casale</u>, 83 Mass. App. Ct. 751, 756-57, 989 N.E.2d 909, 913-14 (2013) (alterations in original).  Thus, the determinative issue for application of the Massachusetts Wage Act over the employment law of another state is whether Massachusetts has the most significant relationship not only to the plaintiff as a citizen of the Commonwealth, but also to her employment relationship with the defendants.  <u>See</u> <u>id.</u>

Ms. Crowe suggests that Massachusetts employment law, rather than New York employment law, applied at the time of her resignation because she was living in Massachu-setts.  Yet, under Massachusetts choice of law principles "a more refined analysis is necessary." <u>Id</u>. at 756, 989 N.E.2d at 913.  The relevant question is whether Massachusetts or New York had "the most significant relationship" to Ms. Crowe and her employment relationship with the defendants.  <u>See</u> <u>id.</u> at 757, 989 N.E.2d at 914.  The Agency's offices are and have been located in New York for the entirety of Ms. Crowe's employment there, and that is where Ms. Crowe worked for over eleven years.  While Ms. Crowe's authors lived across the country, the pub-lishing business was largely centered in New York City.  Major book publishing companies were

located within close proximity to the Agency's offices.  Ms. Crowe testified that when she

moved, the change in her job duties was "[j]ust that [she] was doing it from Massachusetts,"

although she met with Boston contacts and attended more Massachusetts book fairs.  (Tr.

I:174-75).  Her job duties continued to involve signing authors to the Agency, which was still

located in New York.  Her paychecks were issued from New York, she visited New York a

number of times after her move, and she maintained an office there with the Agency.  Ms.

Crowe also appears to have regularly communicated with her co-workers in New York via email.

Although she physically worked in Massachusetts, the focal point of the plaintiff's employment

relationship with the defendants remained in New York.  See Dow, 83 Mass. App. Ct. at 757,

989 N.E.2d at 914 (finding that Massachusetts had most significant relationship for purposes of

choice of law analysis where employer was headquartered in Massachusetts, employee, who

lived in Florida, acquired customers who entered into business with company in Massachusetts,

employee communicated with Massachusetts employer regularly via email, and employee

visited Massachusetts on business multiple times per year).  Accordingly, New York law is

applicable to all of the plaintiff's wage claims against the Agency.[6]

---

[6]  The court notes that the cases cited by the defendants for choice of law analysis miss the mark, because they specifically involve employment relationships between companies and their officers. Because Massachusetts courts "appl[y] the law of the State of incorporation in matters relating to the internal affairs of a corporation," and the employees involved in those cases were fiduciaries of their company, the courts looked to the state of incorporation for the appropriate choice of law.  Harrison v. NetCentric Corp., 433 Mass. 465, 470-71, 744 N.E.2d 622, 628 (2001).  See Astra USA, Inc. v. Bildman, 455 Mass. 116, 135, 914 N.E.2d 36, 51 (2009).  As the plaintiff here was not a fiduciary of the Agency, these cases are inapposite to the present choice of law analysis.

**B.** __Declaratory Judgment__

As discussed _supra_, this court credits the testimony of Ms. Crowe that she and Mr. Klinger verbally agreed to a new employment agreement, under which she was to be paid seventy percent of the commissions received from her authors' publishing deals going forward, regardless whether she remained with the company, and that the Agency would continue to receive its share on those publishing deals. In Count VI of her Amended Complaint, the plaintiff seeks a declaratory judgment that this agreement for post-resignation commissions is enforceable, and that the plaintiff has the right to all future earned commissions from authors or works she represented and closed while working for the defendants.[7] (_See_ Docket No. 4 at 12). In their Amended Answer, the defendants assert as an affirmative defense that any such agreement to pay the plaintiff commissions post-resignation falls within the Statute of Frauds. (_See_ Docket No. 43 ¶ 7). For the reasons detailed herein, this court will issue a declaratory judgment that the plaintiff is entitled to be paid her commissions post-resignation on deals closed while she was at the Agency. The defendants have waived their Statute of Frauds defense. Moreover, it fails on the merits.

As an initial matter, the defendants failed to include or refer to the Statute of Frauds in their Proposed Findings of Fact and Rulings of Law. (Docket No. 73). Similarly, even though the plaintiff addressed the Statute of Frauds in her Proposed Findings and Rulings, the defendants nevertheless did not address the issue in their Reply Memorandum. (Docket No. 75).

---

[7] The plaintiff is also seeking a declaratory judgment that the defendants are jointly and severally liable for damages, attorneys' fees and costs. (_See_ Docket No. 4 at 12). Since the plaintiff is not being awarded any damages or attorneys' fees, there is no need to issue a declaratory judgment on this subject.

Therefore, the affirmative defense is waived.  See Levine v. Lawrence, No. 03-CV-1694(DRH ETB), 2005 WL 1412143, at *5 (E.D.N.Y. June 15, 2005) ("[F]ailure to adequately brief an argument constitutes waiver of that argument . . . .").

Even if this defense is deemed not to have been waived, although the question is a close one, this court would conclude that the Statute of Frauds does not void the instant agreement. The Statute of Frauds provides that certain agreements and contracts must be in writing.  See N.Y. Gen. Oblig. Law § 5-701.  "The purpose of the law is to prevent fraud in the proving of certain legal transactions particularly susceptible to deception, mistake and perjury."  Nasso v. Bio Reference Labs., Inc., 892 F. Supp. 2d 439, 446 (E.D.N.Y. 2012) (internal quotations and citations omitted). "To determine whether the Statute of Frauds bars an agreement, the fundamental question is whether the parties could have performed under the agreement within one year . . . ."  Williams v. Preeminent Protective Servs., Inc., No. 14-CV-5333, 2017 WL 1592556, at *5 (E.D.N.Y. Apr. 28, 2017) (internal quotations and citations omitted).  Where the agreement can be performed within one year, and all that remains to be done beyond that period is the calculation of compensation due, the Statute of Frauds is not a bar.  See Harrison v. Harrison, 57 A.D.3d 1406, 1408, 871 N.Y.S.2d 551, 553 (2008) ("an at-will employment . . . is capable of being performed within one year despite the fact that compensation remains to be calculated beyond the one-year period"); Cron v. Hargro Fabrics, Inc., 91 N.Y.2d 362, 370, 694 N.E.2d 56, 60 (1998) ("when the employment relationship is terminable within a year and the measure of compensation has become fixed and earned during the same period, the sole obligation to calculate such compensation will not bring the contract within the one-year proscription of the Statute of Frauds."); see also Schara v. Commercial Envelope Mfg. Co., Inc.,

[18]

321 F.3d 240, 243 (1st Cir. 2003) (discussing New York law which construes the Statute of Frauds narrowly). Thus, "[t]he fact that the amount of the payment due may not be ascertained until some future time creates no new obligations" which could render the Statute of Frauds applicable. <u>Rifkind v. Web IV Music, Inc.</u>, 67 Misc. 2d 26, 34, 323 N.Y.S.2d 326, 335 (Sup. Ct. 1971).

In the instant case, as between Ms. Crowe and the Agency, her employment was at-will and could be terminated within one year. Consequently, her employment agreement should not be deemed to come under the Statute of Frauds. <u>See</u> <u>Murphy v. CNY Fire Emergency Servs., Inc.</u>, 225 A.D.2d 1034, 1035, 639 N.Y.S.2d 628, 630 (1996) (as a general rule, an oral agreement that is terminable at will is considered to be capable of performance within one year for purposes of the Statute of Frauds). Obviously, her ability to sign authors for whom she would be entitled to a percentage of the Agency's commissions was dependent on her employment and similarly could be terminated within a year. Moreover, with respect to her entitlement to commissions, the Agency became entitled to payment once the author signed with the publisher. Ms. Crowe's right to a percentage of the Agency's compensation was a mere ministerial act, requiring nothing more by either party other than the cutting of a check once the Agency received payment.[8] "Since the measure of defendant's obligation to compensate its employee is fixed within a year, the dangers envisioned by the Statute of Frauds do not come into play." <u>Cron</u>, 91 N.Y.2d at 370, 694 N.E.2d at 61. Thus, where, as here, "the amount of the commissions due could not be determined until some future time, such future

---

[8] This court expresses no opinion as to whether the Statute of Frauds required the Agency's contracts with the authors or publishers to be in writing.

satisfaction of a pre-existing liability involves the matter of computation only and is merely mechanical in its application." Gold v. Benefit Plan Adm'rs, Inc., 233 A.D.2d 421, 421, 649 N.Y.S.2d 482, 483 (1996) (oral agreement entitling an employee to commissions on contract sales finalized prior to the employee's termination not barred by the Statute of Frauds).

In sum, the defendants waived the Statute of Frauds, despite having had several opportunities to address the issue. If the court were to address the merits, this court would conclude that so long as the Agency received payment from the publishers, the cutting of the check to Ms. Crowe was a ministerial act not barred by the Statute of Frauds.[9] Therefore, a declaratory judgment will enter that, with respect to deals she closed while at the Agency, the plaintiff is to be paid seventy percent of the commissions received from her authors' publishing deals going forward, regardless whether she remained with the company, and that the Agency shall continue to receive its share on those publishing deals as well.

C.      Faithless Servant

The defendants assert, as both an affirmative defense and a counterclaim, that the plaintiff qualifies as a "faithless servant" under New York common law and is not entitled to compensation as of August 10, 2016, the date on which Ms. Crowe received a draft contract for Varian Johnson's "Spirit Animals." They also assert that, as a faithless servant, the plaintiff is not entitled to commissions on all deals that the plaintiff "diverted" from the Agency to Pippin.

---

[9] Because the Statute of Frauds is not a valid defense to this action, and the parties' oral agreement is enforceable, this court need not address the plaintiff's other arguments that she is entitled to post-resignation commissions pursuant to the presumption articulated in N.Y. Lab. Law § 191(1)(c) or under the common law default rule as to when an employee's commissions are earned.

For the reasons discussed herein, this court concludes that the plaintiff did not act as a faithless servant.

New York's faithless servant doctrine provides for the forfeiture of compensation otherwise owed to employees who are disloyal to their employer.  See Levy v. Young Adult Inst., Inc., 103 F. Supp. 3d 426, 440 (S.D.N.Y. 2015).  Stated differently, "[a]n agent who is found to be faithless in the performance of his fiduciary duties is generally liable for all compensation from the date of the breach."  Khaldei v. Kaspiev, 135 F. Supp. 3d 70, 84 (S.D.N.Y. 2015) (citation omitted).  But see Astra USA, Inc., 455 Mass. at 130, 914 N.E.2d at 47, and cases cited (applying New York law and chronicling traditional, absolute forfeiture rule, but noting that New York's intermediate courts have more recently carved out limitations to forfeiture).

"Courts applying New York law have used two different standards for the faithless servant doctrine . . . ."  Levy, 103 F. Supp. 3d at 440 (citation omitted).  "The first—and more stringent—standard is satisfied where the misconduct and unfaithfulness . . . substantially violates the contract of service such that it permeate[s] [the employee's] service in its most material and substantial part."  Khaldei, 135 F. Supp. 3d at 84 (alteration in original) (internal quotations and citations omitted).  "By comparison, the second standard requires that the agent's misconduct 'rise[] to the level of a breach of a duty of loyalty or good faith.'"  Id. (quoting Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 202 (2d Cir. 2003)).  Under this standard, all an employee needs to do to be considered a faithless servant is to compete with his or her employer or misappropriate opportunities belonging to an employer while still on the payroll.  See Bon Temps Agency Ltd. v. Greenfield, 184 A.D.2d 280, 281, 584 N.Y.S.2d 824, 826 (N.Y. App. Div. 1992); Mar. Fish Prods., Inc. v. World-Wide Fish Prods., Inc., 100 A.D.2d

81, 88, 474 N.Y.S.2d 281, 285 (N.Y. App. Div. 1984). However, even under this standard, plans or preliminary steps toward competing with one's employer do not rise to the level of a faithless servant. See Feiger v. Iral Jewelry, Ltd., 41 N.Y.2d 928, 929, 363 N.E.2d 350, 351 (1977) (holding employee must lessen work or misuse employer secrets to constitute faithless servant); Bon Temps Agency, Ltd., 212 A.D.2d at 428, 622 N.Y.S.2d at 710-11 (noting distinction between preliminary steps to compete and actual competition). Because this court concludes that the plaintiff does not constitute a faithless servant under either standard, this court will apply the latter, more employer-friendly, standard.

As detailed above, this court finds that the plaintiff refrained from contacting her clients to recruit them to Pippin until after she resigned from the Agency. While the plaintiff's conversations with Ms. McGhee and counsel in this period of time indicate that the plaintiff wanted to bring her clients with her, the doctrine requires actual conduct aimed toward the divergence of a corporate opportunity from the employer. See, e.g., Design Strategies, Inc. v. Davis, 384 F. Supp. 2d 649, 660 (S.D.N.Y. 2005), aff'd sub nom. Design Strategy, Inc. v. Davis, 469 F.3d 284 (2d Cir. 2006) (faithless servant case wherein employee, while still employed, notified future employers of corporate opportunity and provided them with specific instructions for securing the contract over other firms, including, potentially, employee's current employer). Cf. Mar. Fish Prods., Inc., 100 A.D.2d at 88, 474 N.Y.S.2d at 285 (employee was faithless servant where he "secretly pursued and profited from one or more opportunities properly belonging to his employer."). Indeed, the email that the defendants chiefly rely on to show the plaintiff's disloyal conduct, which references the plaintiff's statement to Ms. McGhee that she "would like to move over [two contracts drafted at the Agency], *as would the authors*,"

was sent the day after her resignation.  (See Tr. Ex. 27 (emphasis added)).[10]  Moreover,

although the defendants attempt to portray Ms. Crowe's consultation with counsel as a sinister

step, there is nothing improper about consulting with an attorney before resigning to insure

that the departing employee acts appropriately and within the law.  Accordingly, the record

does not support the defendants' contention that the plaintiff actively attempted to separate

clients from the Agency prior to her resignation.  See Linder v. Innovative Commercial Sys. LLC,

41 Misc. 3d 1214(A), 981 N.Y.S.2d 636, 2013 WL 5663173, at *5 (N.Y. Sup. 2013), aff'd, 127

A.D.3d 670, 8 N.Y.S.3d 191 (N.Y. App. Div. 2015) ("The evidence here shows there was neither

theft of property nor active divergence of corporate opportunities.").

   The defendants further contend that the plaintiff deliberately delayed signing contracts

that were otherwise ready to be signed until she left the Agency.  Yet, as detailed above, the

deals at issue did not result in a signed contract at Pippin until months later, if at all, and often

after significant revisions from the contract drafts as they had existed at the Agency.  Indeed,

many of the "potential" deals Ms. Crowe brought with her to Pippin did not come to fruition.

(See Tr. I:101-02, 105-10 (testifying as to 2016 deals listed in email to Pippin that did not

materialize or have not yet been finalized)).

   With respect to the two specific deals on which the defendants rely, Varian Johnson's

"Spirit Animals" had not yet been fully negotiated before Ms. Crowe left the Agency, and the

deal was not consummated until months after she left.  While Ms. Crowe received a first draft

of the contract on August 10, 2016, it was not signed until November or December of 2016.

---

[10]  The defendants inaccurately state in their Proposed Findings of Fact and Rulings of Law (Docket No. 73) that this email was sent on August 29, 2016.  The email was entered as an exhibit at trial and clearly displays a timestamp of September 9, 2016, the day after the plaintiff's resignation.  (See Exhibit 27).

There is no evidence in the record that the deal could have been completed before September 8, 2016, when Ms. Crowe resigned from the Agency. With respect to the Dori Butler contract, while Ms. Crowe thought the contract was ready to sign while she was at the Agency, the author did not. (Tr. II:38). Moreover, the author did not want to sign with the Agency, but preferred Pippin. (Tr. Ex. 27 at PP00017). This court expresses no opinion on whether Ms. Crowe was obligated to agree, as she apparently did, that the Agency receive compensation from this contract. In any event, it is clear that Ms. Crowe did not act as a faithless servant in connection with her handling of these contracts. In sum, the record does not establish that the plaintiff was liable for any "breach of fidelity" prior to her resignation. Feiger, 41 N.Y.2d at 929, 363 N.E.2d at 351; see also Linder, 2013 WL 5663173, at *5 ("A salesman compensated solely on commission does not breach either a duty of good faith or of loyalty by failing to zealously pursue sales."). Thus, while the plaintiff may have engaged in preliminary steps toward transitioning to Pippin, she did not actively compete with the Agency while still employed there, and the defendants are not entitled to recovery under the faithless servant doctrine.

### D.    **Timely Payment**

In Count IV of her Complaint, Ms. Crowe contends the defendants violated the Massachusetts Wage Act by failing to timely pay wages owed. As explained above, this court concludes that New York law governs all claims in this case. Accordingly, the plaintiff's Massachusetts Wage Act claims must be dismissed. However, even assuming that Massachusetts law should apply, the plaintiff would not be entitled to treble damages in the amount of her delayed paychecks.

At issue in the instant case are payments made for the two pay periods immediately following the plaintiff's resignation.  After the plaintiff resigned, defendants took the legal position that she was not legally entitled to any commissions earned from the day they asserted that she began acting as a faithless servant.  (See Tr. Ex. 68 at 3).  Defense counsel reached out to plaintiff's counsel on September 30, 2016, four days before Ms. Crowe's first post-resignation paycheck was due, to provide Mr. Klinger's legal position and open the door to settlement discussions.  (Id.).  Plaintiff's counsel did not respond for five days, until the day after Ms. Crowe's first post-resignation paycheck came due.  (Id. at 2).  In his response, plaintiff's counsel indicated that he would be willing to discuss settlement and suggested scheduling a time to speak the following week.  (Id.).  Defense counsel replied that the proposed date for settlement discussions was "fine so long as [the plaintiff] will not complain about the delay of her check," but by that point the plaintiff had already filed a Wage Act complaint.  (Id.)  Ultimately, the payment at issue, as well as the payment for the next pay period, were provided two weeks later on October 19, 2016.  In light of this timeline, this court finds that the delay in payment was the result of settlement discussions between the parties.

The plaintiff correctly notes that the Wage Act imposes strict liability on employers.  See Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 21 (1st Cir. 2018); Somers v. Converged Access, Inc., 454 Mass. 582, 591, 911 N.E.2d 739, 749 (2009).  The plaintiff thus insists that she is entitled to treble damages on the total amount that was paid late, irrespective of the reason for the delay.  However, treble damages specifically apply to "lost wages and other benefits" that the plaintiff has suffered.  Mass. Gen. Laws ch. 149, § 150.  Here, the plaintiff has not suffered any lost wages.  The only injury asserted is that her wages were paid two weeks late.

Accordingly, under Massachusetts law the plaintiff would at best only be entitled to interest on the two-week delay, not treble damages on the entirety of her delayed paychecks.  See Clermont v. Monster Worldwide, Inc., 102 F. Supp. 3d 353, 359 (D. Mass. 2015).  Even such interest payments would not be warranted here, however, in light of the fact that the checks were delayed due to an expressed interest on the part of plaintiff's counsel in negotiating a settlement of the dispute.

The defendants' delay in payment is not untimely under New York law.  Article 6 provides that employees must be paid in a timely manner.  See N.Y. Lab. Law § 191.  Timeliness under the statute depends on the categorization of the employee in question.  See id.  Article 6 "defines a 'commission salesman' as an 'employee' whose earnings are based in whole or in part on commissions, and a person who is not an employee but an independent contractor is not within the scope of this section."  Kirsch v. Fleet St., Ltd., 148 F.3d 149, 170 (2d Cir. 1998) (citations omitted).  The parties appear to concede that the plaintiff is most appropriately categorized as a commission salesperson.[11]  (See Docket No. 72 at 17; Docket No. 73 at 16).

---

[11]  In their Proposed Findings of Fact and Rulings of Law, the defendants appear to adopt this position. (See Docket No. 73 at 16).  However, the defendants' subsequent Reply Brief asserts that the plaintiff falls under the definition of a professional, rather than a commission salesperson, and thus is not entitled to the protections of Article 6.  (See Docket No. 75 at 13-14).  To the extent the defendants are not estopped from making this argument by raising it for the first time in a reply brief after making the contrary argument in their Proposed Findings of Fact and Rulings of Law, it is substantively deficient. The plaintiff plainly fits within the definition of commission salesperson under N.Y. Lab. Law § 190(6). Further, the record does not indicate that her "principal activity" was "of a supervisory, managerial, executive or administrative nature."  Here the plaintiff was tasked with the same work as her coworkers – to create and maintain a list of clients and connect them to publishers.  She did not oversee other employees, hold an officer position within the company, or perform unique duties within the organization.  (See, e.g., Tr. I:67 (explaining that another employee, David Dunton, was in charge of payroll, in addition to his regular responsibilities)).

The defendants are also incorrect to assert that classifying the plaintiff as an executive would disqualify her from any of the protections of Article 6.  Although executives are excluded from the protections of § 191 and are not entitled to attorneys' fees under § 198(1-a), they are otherwise

The wages and commissions of a commission salesperson must be paid at least "once in each month and not later than the last day of the month following the month in which they are earned." N.Y. Lab. Law § 191(1)(c). Accordingly, because the payments were made in mid-October and corresponded to pay periods in September and October, they were timely within the definition of § 191(1)(c).

      **E.**    <u>**Retaliation**</u>

      The plaintiff also asserts a claim for retaliation, noting that both Massachusetts and New York prohibit such conduct. As detailed above, New York law applies here. However, the same results would be reached under Massachusetts law. <u>See</u> Mass. Gen. Laws ch. 149, § 148A (Massachusetts worker retaliation statute); <u>Smith v. Winter Place LLC</u>, 447 Mass. 363, 367, 851 N.E.2d 417, 421 (2006) (interpreting Mass. Gen. Laws ch. 149, § 148A in a manner that is consonant with the elements of a New York retaliation claim).

      Under N.Y. Lab. Law § 215(1)(a), "[n]o employer or his or her agent, or the officer or agent of any corporation, partnership, or limited liability company, or any other person, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee . . . because such employee has made a complaint to his or her employer . . . or any other person, that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter . . . ." Accordingly, to state a claim under N.Y. Lab. Law § 215(1)(a), "a plaintiff must adequately plead that while employed by the defendant, he or she made a complaint about the employer's violation of New York Labor Law

---

protected by the provisions of Article 6. <u>See</u> <u>Pachter v. Bernard Hodes Grp., Inc.</u>, 10 N.Y.3d 609, 616, 891 N.E.2d 279, 283 (2008) ("executives are employees for purposes of Labor Law article 6, except where expressly excluded" (footnote omitted)).

and was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action as a result." Higueros v. N.Y. State Catholic Health Plan, Inc., 526 F. Supp. 2d 342, 347 (E.D.N.Y. 2007) (citations omitted).[12] "An adverse employment action must affect[] the terms, privileges, duration, or conditions of the plaintiff's employment." D'Amato v. Five Star Reporting, Inc., 80 F. Supp. 3d 395, 420 (E.D.N.Y. 2015) (internal quotations and citations omitted) (alterations in original). "Once the plaintiff establishes *a prima facie* case of retaliation under Section 215, the burden shifts to the defendant to produce evidence suggesting that it had a legitimate, non-retaliatory explanation for its actions." Esmilla v. Cosmopolitan Club, 936 F. Supp. 2d 229, 239 (S.D.N.Y. 2013) (citation omitted).

The plaintiff alleges that after she told Mr. Klinger that she was owed post-resignation commissions, the defendants subjected her to an adverse employment action by temporarily withholding her first two post-resignation commission payments and threatening to sue. As to the delay in payment, the defendants have provided a legitimate, non-retaliatory explanation for the delay that is supported by the evidence. The defendants took the legal position that the plaintiff was not legally entitled to post-resignation commissions and briefly withheld the wages while awaiting a response from plaintiff's counsel to determine if settlement discussions would be fruitful. Plaintiff elected to file the Wage Act Claim and sue prior to giving settlement discussions a chance. (See Tr. Ex. 68). As to the defendants' threat to sue, the record does not

---

[12] Despite the fact that this definition refers to complaints made while employed by the defendant, "most cases have found that Section 215 applies to [both] current and *former* employers." Romero v. Bestcare Inc., No. CV 15-7397 (JS)(GRB), 2018 WL 1702001, at *4 (E.D.N.Y. Feb. 28, 2018) (emphasis in original); see Oram v. SoulCycle LLC, 979 F. Supp. 2d 498, 510 (S.D.N.Y. 2013) ("To leave a discharged employee without remedy for retaliation because of a failure to have complained during employment defeats the salutary purpose of § 215.").

indicate that this threat constituted an adverse employment action.  Although Ms. Crowe

testified that she was concerned she might lose her job and her clients if Mr. Klinger followed

through, the record does not indicate that the threat of litigation did in fact affect her

professional reputation or job prospects.  <u>See</u> <u>D'Amato</u>, 80 F. Supp. 3d at 420 (employer's

counterclaims did not constitute adverse employment action where employee failed to allege

facts plausibly suggesting that her reputation or job prospects were affected).  <u>Cf.</u> <u>Bill Johnson's</u>

<u>Rests., Inc. v. N.L.R.B.</u>, 461 U.S. 731, 743, 103 S. Ct. 2161, 2170, 76 L. Ed. 2d 277 (1983) ("The

filing and prosecution of a well-founded lawsuit may not be enjoined as an unfair labor

practice, even if it would not have been commenced but for the plaintiff's desire to retaliate

against the defendant for exercising rights protected by the Act.").  For these reasons,

Ms. Crowe has failed to sustain a claim of retaliation.

     **F.**    <u>**Failure to Provide Pay Stub**</u>

Under N.Y. Lab. Law § 195(3), employers must

> furnish each employee with a statement with every payment of wages,
> listing the following information: (1) the dates of work covered by that
> payment of wages; (2) the employee's name; (3) the employer's name,
> address, and telephone number; (4) the rate or rates of pay and basis
> thereof; (5) gross wages; (6) deductions; (7) allowances, if any, claimed
> as  part of the minimum wage; and (8) net wages.

<u>Salinas v. Starjem Rest. Corp.</u>, 123 F. Supp. 3d 442, 475 (S.D.N.Y. 2015) (footnote and internal

quotations omitted) (quoting N.Y. Lab. Law § 195(3)).  However, employers who fail to comply

with these requirements may assert, as an affirmative defense, that they "made complete and

timely payment of all wages due pursuant to [Article 6] . . . to the employee who was not

provided statements as required by [§ 195(3)]."  N.Y. Lab. Law § 198(1-d).

The undisputed testimony at trial indicates that Mr. Klinger did not provide Ms. Crowe with wage statements until 2011 or 2012. (Tr. I:54). In subsequent years, Ms. Crowe was provided with wage statements, but failed to receive them if she did not remind Mr. Klinger to produce them. (Id.). Additionally, the wage statements did not include "the rate or rates of pay and basis thereof," which was provided separately by David Dunton, sometimes via author's statements. (See Tr. Ex. 43; Tr. I:51-52). However, while the record indicates that the defendants did not comply with the wage statement requirements of § 195(3), it also indicates that the defendants made complete and timely payment of all wages due to the plaintiff. The plaintiff has only made claims for untimely payment as to her post-resignation pay periods. (See Tr. II:51). As discussed supra, the plaintiff's untimely payment claim fails under New York law. Ms. Crowe did also testify that one of her other paychecks was delayed over a year. (Tr. I:72). However, on cross-examination she agreed that the check had been sent to her on time but was simply lost in the mail. (Tr. II:19). Accordingly, the defendants made complete and timely payment of the plaintiff's wages, and thus are not liable for the failure to provide the plaintiff with wage statements in compliance with N.Y. Lab. Law § 195(3).

## IV.  ORDER

For the reasons detailed above, a declaratory judgment shall enter that the plaintiff is entitled to any future commissions from deals that she closed while working at the Agency, and the Agency is likewise entitled to its percentage of these commissions. The plaintiff's remaining claims, and the defendants' counterclaims, are dismissed. Each party shall bear their own attorneys' fees.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge